Argued and submitted March 13, on petitions, reversed in part; on cross-petition, affirmed May 21, 2014

# FRIENDS OF THE HOOD RIVER WATERFRONT,
Corie Lahr, and Richard Derek Bell,
*Respondents*
*Cross-Petitioners,*

*v.*

## CITY OF HOOD RIVER,
*Respondent*
*Cross-Respondent,*

*and*

## NBW HOOD RIVER, LLC,
*Petitioner*
*Cross-Respondent.*

# FRIENDS OF THE HOOD RIVER WATERFRONT,
Corie Lahr, and Richard Derek Bell,
*Respondents,*

*v.*

## CITY OF HOOD RIVER,
*Petitioner,*

*and*

## NBW HOOD RIVER, LLC,
*Intervenor-Respondent below.*

Land Use Board of Appeals
2013064; A155860

326 P3d 1229

Steven L. Naito argued the cause for petitioner-cross-respondent NBW Hood River, LLC. With him on the briefs was Tarlow Naito & Summers, LLP.

Daniel H. Kearns argued the cause for petitioner-respondent-cross-respondent City of Hood River. With him on the briefs was Reeve Kearns, PC.

Brent C. Foster argued the cause and filed the briefs for respondents-cross-petitioners Friends of the Hood River Waterfront, Corie Lahr, and Richard Derek Bell.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

LAGESEN, J.

**LAGESEN, J.**

Petitioners NBW Hood River, LLC, (NBW) and the City of Hood River (the city) petition for judicial review of a final order of the Land Use Board of Appeals (LUBA). The order remanded the city's decision granting conditional use and preliminary site plan approval for a waterfront office and hotel development proposed by NBW.[1] The issue on review is whether LUBA erred when it rejected as implausible the city's interpretation of certain provisions of its comprehensive plan addressing development in flood hazard areas and remanded to the city to apply those provisions—as interpreted by LUBA—in determining whether to grant the approval requested by NBW. We affirm in part and reverse in part.

## I. FACTUAL AND REGULATORY BACKGROUND

A. *The City's Plan Provisions and Ordinance Governing Development and Land Use in Floodplains*

As required of all cities by ORS 197.175(2), the city has adopted a comprehensive plan to facilitate its compliance with statewide planning goals, including Goal 7.[2] To meet Goal 7, the plan sets forth "policies," "implementation strategies," and "land use designations and standards" regarding land use and development in floodplains, that is, areas subject to flooding.[3] Pertinent to this case, one of the policies relating to flood hazards—Policy 2—provides

---

[1] Respondents Friends of the Hood River Waterfront (Friends), Corie Lahr, and Richard Derek Bell filed a cross-petition for review. We reject without discussion the assignment of error raised in the cross-petition and, for ease of reference, refer to NBW and the city as "petitioners" and to Friends, Lahr, and Bell as "respondents" throughout this opinion. Although respondents contend that the city's petition is, in reality, a cross-petition that was not timely filed within the filing period for cross-petitions specified in ORAP 4.68(1), we reject respondents' characterization of the city's petition, as well as their assertion that the petition is not properly before us. Because the city's petition was timely filed within 21 days of the LUBA decision on review, it is properly before us, regardless of the timelines established by ORAP 4.68(1) for cross-petitions. *State ex rel Dodd v. Joseph*, 313 Or 333, 337, 833 P2d 1273 (1992) ("Anything filed *within* the 21 days is already timely under ORS 197.850(3), and the Court of Appeals could not diminish that statutory time period by rule." (Emphasis in original.)).

[2] The objective of statewide planning Goal 7 is "[t]o protect people and property from natural hazards," including floods.

[3] The plan defines "policies," "implementation strategies," and "land use designations and standards":

that "[t]he City will continue participation in the Housing and Urban Development National Insurance Program."[4] Another policy—Policy 4—identifies the steps that the city will take where 100-year floodplains[5] have yet to be adequately mapped:

"In cases where detailed mapping of 100-year floodplains is not complete, the 100-year floodplain will be determined by at least one of the following methods:

"a. The natural stream bank drop-off to the current floodplain.

"b. A field inspection.

"c. HUD Special Flood Hazard area maps.

"d. Soil information from the Soil Conservation Service.

"e. Consultation with both the County Sanitarian and the Public Works Director or other applicable agencies."

The plan's Goal 7 implementation strategies and land use designations and standards provide further guidance regarding land use and development in flood hazard areas. Implementation Strategies 3 and 4 state:

"3. Lands subject to flooding shall be identified on the zoning map and designated 'FP' (Floodplain) to implement the policies of this Plan. 'FP' is an overlay combining zone.

---

"**POLICIES**: are intended to be broad statements providing direction for public decisions concerning the goal.

"**STRATEGIES**: are intended to set forth the means for implementing the Plan, i.e., adoption of regulations, special studies.

"**LAND USE DESIGNATIONS AND STANDARDS**: are intended to define the extent of development and broad standards for such development in a given area."

(Capitalization and boldface in original.)

The plan defines a floodplain as "[t]he area adjoining a stream, tidal estuary, or coast that is subject to regional flooding."

[4] Before 1979, the National Flood Insurance Program was administered by the Department of Housing and Urban Development. In 1979, responsibility for the program shifted to the Federal Emergency Management Agency (FEMA).

[5] A 100-year flood is a flooding event that has a one-percent chance of being equaled or exceeded in any given year. The 100-year floodplain consists of the area adjacent to a river, stream, or other waterway that would be inundated in the event of a 100-year flood.

"4. No permanent structure shall be erected within a flood hazard area unless the structure or the area meets the criteria set forth in the 'FP' overlay zone."

Finally, the land use designation and standard "FLOODPLAIN, 'FP' COMBINING ZONE" sets forth specific criteria designed "to protect the public health, safety, and general welfare [in] flood susceptible areas." It provides:

"The purpose of the 'FP' combining zone is to protect the public health, safety, and general welfare by demarcating flood-susceptible areas. The ['FP'] designation is an overriding zone and is designed to be used with any existing base zones.

"1. Uses permitted in the 'FP' zone area as follows:

"a. Non-habitable structures, barns, or other structures.

"b. Boat docks and landings for recreational use, not including structures.

"c. Parks and playgrounds, not including incidental buildings.

"2. Site development standards shall be the same as required in the base zone. Planned Unit Development or on-site density transfer techniques are permitted on land within the floodplain in order to permit development to cluster outside the floodplain and retain flood hazard areas as open space.

"3. Uses not enumerated above which are permitted in the base zone may be established, altered, or enlarged subject to compliance with any or all of the following conditions:

"a. An architect or engineer, licensed in the State of Oregon, designs the structure to be flood-proof and the design is approved by the City Building Official.

"b. The proposed structure or land is protected if necessary from flooding by a dike designed by an engineer licensed in the State of Oregon.

"c. Proper access for emergency vehicles will be provided to the proposed site.

"d.   No permanent structures or fill materials are permitted which would inhibit the stream flood flows or endanger other property.

"e.   Containers holding chemical pesticides or herbicides or any other toxic chemicals shall not be stored within 300 feet of any stream way.

"4.   Development or occupancy of any of the lands designated 'FP' (floodplain) will not be permitted without approval by the Hood River City Planning Commission. Before approval will be considered, proponents of the development will be required to submit a report that addresses, at a minimum, the following:

"a.   A description of the proposed use.

"b.   The impact on the area.

"c.   A diagram of the proposed structure and the relation to the floodplain.

"d.   Proposed mitigating measures."

The comprehensive plan is not the city's only law addressing flood hazard areas. In compliance with Goal 7, Policy 2, the city has adopted an ordinance—Hood River Municipal Code (HRMC) chapter 15.44—in order to comply with federal prerequisites for participation in the National Flood Insurance Program.[6] HRMC chapter 15.44 serves to ensure the continued availability of flood insurance to the citizens of Hood River. Like the standards and strategies in the comprehensive plan, the ordinance addresses flood hazards and contains a number of restrictions on development within "area[s] of special flood hazard," which are defined by the ordinance to be areas within the 100-year floodplain. According to the city's order in this case, the lands currently within the "FP" Zone also qualify as "area[s] of special flood hazard" under HRMC chapter 15.44, and are subject to both the requirements of the "FP" Zone and of HRMC chapter 15.44.

---

[6] The ordinance originally was adopted before the adoption of the city's comprehensive plan as an emergency measure to allow the city to participate in the National Flood Insurance Program.

B. *NBW's Proposal to Develop a Site within the 100-year Floodplain, the City's Approvals of NBW's Proposal, and LUBA's Rejection of those Approvals*

NBW proposes to construct a hotel, office building, and parking lot on the waterfront of Nichols Boat Basin in the City of Hood River. Nichols Boat Basin is located near the confluence of the Hood River and the Columbia River. It is fed by the Columbia River and is separated from the Hood River by a breakwater. The office building would be constructed partly on land immediately adjacent to the Nichols Boat Basin and partly on piers that would be submerged at times of ordinary high water. The floodplains on the site have not been mapped in detail, but the site is subject to flooding, the majority of the site falls within the 100-year floodplain, and the proposed office building will be constructed within the 100-year floodplain.

NBW applied to the city for a conditional use permit and a site plan approval for the project. The city granted the approvals, and respondents appealed the decision to LUBA. LUBA remanded to the city to determine, among other things, whether Goal 7, Policy 4, Implementation Strategy 4, and the "FP" Zone criteria were mandatory approval criteria applicable to NBW's application and, if so, to apply those criteria.[7]

On remand, the city concluded that Policy 4, Implementation Strategy 4, and the "FP" Zone criteria were not mandatory approval criteria applicable to NBW's application. Specifically, the city determined that Policy 4 contained no mandatory approval criteria at all and therefore did not apply to NBW's proposal for that reason, although the city also concluded that the provision provided "guidance" for identifying the 100-year floodplain on the proposed project site. The city found that Implementation Strategy 4 and the "FP" Zone criteria were mandatory approval criteria for sites within the "FP" Zone, but did not apply to sites outside of the "FP" Zone, even if those sites were within the floodplain. The city reasoned that to apply the "FP" Zone criteria to sites outside the "FP" Zone—even if those sites

---

[7] From this point forward, we refer to Goal 7, Policy 4 as "Policy 4" and to Goal 7, Implementation Strategy 4 as "Implementation Strategy 4."

were, in fact, flood hazard areas—"would effectively read the 'FP' Zone off the zoning map and give it no effect." Because NBW's site was not contained within the "FP" Zone, the city reasoned that the "FP" Zone criteria did not apply to NBW's proposal.

Respondents again appealed the city's decision to LUBA, and LUBA again remanded to the city. Although LUBA rejected most of respondents' assignments of error, LUBA sustained in part respondents' assignment of error challenging the city's application of Policy 4 and sustained respondents' assignments of error challenging the city's interpretation and application of Implementation Strategy 4 and the "FP" Zone criteria. LUBA agreed with the city that Policy 4 was not written as a mandatory approval criterion for a conditional use approval. LUBA nonetheless concluded that Policy 4 did create "an applicable mandatory require-ment to identify the location of the 100-year floodplain on the property, because detailed mapping of the 100-year floodplain on the property is not available." Based on that conclusion, LUBA concluded that, "[o]n remand, the city will need to have the applicant prepare that map" of the 100-year floodplain on the property.

· With respect to Implementation Strategy 4 and the "FP" Zone criteria, LUBA concluded that Implementation Strategy 4 made the "FP" Zone criteria applicable to NBW's application and that the city's contrary conclusion was not plausible. LUBA stated that it "d[id] not understand" the city's conclusion that applying Implementation Strategy 4 to flood hazard areas that were not contained in the "FP" Zone would render the "FP" Zone meaningless. LUBA fur-ther reasoned that to construe Implementation Strategy 4 to apply only to flood hazard areas that had been mapped and added to the "FP" Zone would render Implementation Strategy 4 a nullity, would add a limitation to the provi-sion that the city itself had not added, and would undermine the plan's evident objective of ensuring that development on floodplains meet the standards for construction in flood hazard areas. Based on that conclusion, LUBA remanded to the city to "ensure that the proposal complies with Implementation Strategy 4, which requires that 'No perma-nent structure shall be erected within a flood hazard area

unless the structure or the area meets the criteria set forth in the "FP" overlay zone.'"

Petitioners thereafter sought review in this court; respondents cross-petitioned for review.

## II.   STANDARD OF REVIEW

This court reviews whether LUBA's order is "unlawful in substance or procedure." ORS 197.850(9)(a).

## III.   ANALYSIS

The issue on review is whether LUBA's rejection of the city's interpretation of its comprehensive plan provision relating to floodplains, and its related determinations (a) that Implementation Strategy 4 requires the city to apply the "FP" Zone criteria to NBW's proposal and (b) that Policy 4 requires NBW to provide a map of the 100-year floodplain on the project site, are "unlawful in substance." ORS 197.850(9)(a). LUBA's rejection of the city's interpretation of its own comprehensive plan is "unlawful in substance" unless the city's interpretation

"(a)   Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b)   Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c)   Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d)   Is contrary to a state statute, land use goal or rule that the comprehensive plan or land use regulation implements."

ORS 197.829(1).

Whether the city's interpretation of its comprehensive plan is inconsistent with the plan, or the purposes or policies underlying that plan, "depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993),] as modified by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)." *Setniker v. Polk*

*County,* 244 Or App 618, 633-34, 260 P3d 800, *rev den,* 351 Or 216 (2011) (internal quotation marks omitted; brackets in original); *see also Mark Latham Excavation, Inc. v. Deschutes County,* 250 Or App 543, 552-53, 281 P3d 644 (2012) (same). Put simply, our task on review in this case is to determine whether the city's interpretation of the floodplain provisions of its comprehensive plan "plausibly accounts for the text and context" of those provisions. *Siporen v. City of Medford,* 349 Or 247, 262, 243 P3d 776 (2010).

A. *LUBA Correctly Rejected the City's Interpretation of Implementation Strategy 4.*

The primary dispute among the parties concerns LUBA's rejection of the city's interpretation of Implementation Strategy 4. The city and NBW both contend that LUBA did not afford the city's interpretation the deference mandated by ORS 197.829, as construed in *Siporen.* We disagree.

As noted above, Implementation Strategy 4 states, "No permanent structure shall be erected within a flood hazard area unless the structure or the area meets the criteria set forth in the 'FP' overlay zone." Understood in a common-sense way, that implementation strategy requires that NBW's proposed development meet the requirements of the "FP" overlay zone. NBW proposes to build a permanent building on the waterfront in an area that is in the 100-year floodplain and undisputedly subject to flooding.[8] In other words, NBW proposes to place a permanent structure in what is, as a factual matter, a flood hazard area.

Notwithstanding the fact that, if the plain terms of Implementation Strategy 4 are given their ordinary meaning, they would apply to NBW's proposal, the city interpreted Implementation Strategy 4 not to apply to NBW's proposal. The city did so by concluding that the phrase "flood hazard area" in Implementation Strategy 4 means an "area within the 'FP' Zone." As LUBA correctly recognized, that reading of Implementation Strategy 4 suffers from many conspicuous

---

[8] At the hearing on remand from LUBA, counsel for NBW acknowledged, among other things, that "certainly *** we are building in the floodplain" and that, in the event of a 100-year flood, the access road to the site "could be inundated."

deficits and, in the end, cannot plausibly be squared with the text and context of the provision.

To start, the city's interpretation rejects the most natural, ordinary reading of Implementation Strategy 4, which is that any permanent structure in an area that is, in fact, a flood hazard area will need to meet the requirements of the "FP" Zone. *Columbia Riverkeeper v. Clatsop County*, 238 Or App 439, 445, 243 P3d 82 (2010) (in evaluating a local government's interpretation of a comprehensive plan provision, the reviewing court "giv[es] words of common usage their plain, natural and ordinary meaning" (internal quotation marks omitted)). Moreover, the city's interpretation rewrites Implementation Strategy 4, adding words to it that the city did not include at the time it adopted the provision. In effect, as interpreted by the city, Implementation Strategy 4 provides, "No permanent structure shall be erected within a flood hazard area [*within the 'FP' overlay zone*] unless the structure or the area meets the criteria set forth in the 'FP' overlay zone." That conflicts with the principle that a comprehensive plan or ordinance ordinarily should not be interpreted "to insert what has been omitted." ORS 174.010; *Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 210, 210 n 2, 214 P3d 68 (2009) (applying ORS 174.010 in the context of interpreting a county land use ordinance).

Another problem with the city's interpretation is that it renders Implementation Strategy 4 a superfluity. By its plain terms, the plan's land use designation and standard "Floodplain, 'FP' Combining Zone" requires that areas within the "FP" Zone comply with the requirements of the zone. In other words, all flood hazard areas that are already in the "FP" Zone are necessarily required to meet the criteria of the zone simply by virtue of the fact that they have been included in the zone. Consequently, Implementation Strategy 4 serves no independent purpose, if it is interpreted as the city interprets it. *See State v. Cloutier*, 351 Or 68, 98, 261 P3d 1234 (2011) ("[A]n interpretation that renders a statutory provision meaningless should give us pause.").

Finally, the city's interpretation of Implementation Strategy 4 is inconsistent with the context of the provision. Goal 7, Implementation Strategy 3, contemplates that, at

some point, *all* lands subject to flooding will be added to the "FP" Zone: "Lands subject to flooding shall be identified on the zoning map and designated 'FP' (Floodplain) to implement the policies of this Plan. 'FP' is an overlay combining zone." Policy 4 recognizes that the process of identifying and mapping flood hazard areas cannot occur instantaneously and sets forth a methodology for identifying the 100-year floodplains "[i]n cases where detailed mapping of the 100-year floodplains is not complete[.]" That context indicates that the ultimate objective of the comprehensive plan provisions relating to flood hazards is to protect people and property from flood hazards by identifying *all* lands subject to flooding within the city and ensuring that development on those lands comports with the standards established for the "FP" Zone.

The city's interpretation would thwart that objective. Under it, areas that are, in fact, subject to flooding—and thus required to be added to the "FP" Zone at some point—would be exempt from compliance with the "FP" Zone requirements simply because the city had not yet completed its obligation under the plan to identify and map all areas subject to flooding. By contrast, interpreting Implementation Strategy 4 to apply to all flood hazard areas in the city would ensure that people and property are not deprived of the protections afforded by the "FP" Zone standards simply because the city has not completed its task under Implementation Strategy 3.[9]

Notwithstanding those difficulties with the city's interpretation, the city and NBW assert that we must defer to the city's interpretation—and that LUBA erred by not doing so—because, in their view, to interpret the provision otherwise would render the "FP" Zone meaningless. We fail to see how. The "FP" Zone is meaningful because it catalogs those areas subject to flooding that have been mapped

---

[9] It is unclear from the record why the city has not completed the process of identifying all areas subject to flooding and adding them to the "FP" Zone. According to the city's brief, the city stopped the process of updating its "FP" Zone map around 1981, apparently under the view that the Goal 7 provisions of the plan are "out-dated" in the light of HRMC chapter 15.44. Leaving aside the fact that HRMC chapter 15.44 originally was adopted before the plan provisions at issue, the appropriate process for dealing with an antiquated law is to amend or repeal it, not to ignore it.

and identified and makes clear that those areas must comply with the requirements of the "FP" Zone. The fact that there continue to be flood hazard areas that are not yet in the "FP" Zone—such as the area affected by NBW's proposal—does not render the "FP" Zone meaningless; it simply means that the city has not yet completed its charge under Implementation Strategy 3 to identify and add all such areas to the "FP" Zone.

The city further contends that LUBA was required to accept the city's interpretation of Implementation Strategy 4, because, in the city's view, the interpretation represents a "'considered determination' that plausibly harmonized the conflict between the FP Overlay regulations in the [comprehensive plan] and the Flood Hazard regulations in HRMC Ch 15.44." However, contrary to the implication of that argument, in its order, the city did not conclude that there was any conflict between the requirements of the "FP" Zone and HRMC chapter 15.44. In fact, the city expressly acknowledged in its order that the areas in the "FP" Zone are also regulated by HRMC chapter 15.44, finding that floodplains in the "FP" Zone are a "subset" of the floodplains covered by HRMC chapter 15.44. That acknowledgment that both sets of regulations can—and do—apply simultaneously refutes the city's assertion on review that the city's interpretation of Implementation Strategy 4 is entitled to deference because the city was acting to resolve a conflict between the plan and the ordinance.

The city and NBW raise a number of other arguments as to why Implementation Strategy 4 should be construed to apply only to flood hazard areas that have been added to the "FP" Zone. None of those arguments overcomes the identified textual and contextual problems with reading that limitation into Implementation Strategy 4, and we reject them for that reason.

In sum, the city's interpretation of Implementation Strategy 4 conflicts with that provision's text and context. LUBA properly rejected that interpretation under ORS 197.829 and remanded to the city to apply Implementation Strategy 4 to NBW's proposal, as dictated by the plain terms of that provision.

B.  *LUBA Erroneously Determined that Goal 7, Policy 4,
    Required the City to Require NBW to Map the 100-year
    Floodplain on Remand.*

NBW and the city also assign error to LUBA's
determination that the city is required by Policy 4 to have
NBW map the 100-year floodplain on the site affected by
its proposal. We agree that LUBA erred to the extent that
it construed that provision to require NBW to map the
100-year floodplain. Although we agree with LUBA that the
provision represents a mandatory requirement to identify
the 100-year floodplains in connection with a project on a
site where the floodplains have not yet been identified, noth-
ing in the text or context of that provision expressly requires
that identification to take the form of a map prepared by
the applicant. Accordingly, the city's implicit interpreta-
tion of Policy 4 to not require NBW to produce a map of the
100-year floodplain is a plausible reading of Policy 4, and
LUBA erred when it ruled that, "[o]n remand, the city
will need to have the applicant prepare that map [of the
100-year floodplain]."

## IV.  CONCLUSION

For the foregoing reasons, LUBA's order is reversed
to the extent that it ordered the city to require NBW to pre-
pare a map of the 100-year floodplain on remand. LUBA's
order is affirmed in all other respects.

On petitions, reversed in part. On cross-petition,
affirmed.