Argued and submitted April 11, affirmed on petition and cross-petition
July 6, 2017

James J. NICITA,
*Petitioner*
*Cross-Respondent,*
*and*

Elizabeth GRASER-LINDSEY,
Christine Kosinski, and Paul Edgar,
*Intervenors-Petitioners below,*

*v.*

CITY OF OREGON CITY,
*Respondent*
*Cross-Respondent,*
*and*

HISTORIC PROPERTIES, LLC,
*Respondent*
*Cross-Petitioner.*

Land Use Board of Appeals
2016045; A164237

399 P3d 1087

James J. Nicita argued the cause and filed the briefs for
petitioner-cross-respondent *pro se.*

Seth King argued the cause for respondent-cross-petitioner Historic Properties, LLC. With him on the brief were Michael C. Robinson and Perkins Coie LLP.

Carrie A. Richter argued the cause for respondent-cross-respondent City of Oregon City. With her on the brief was Bateman Seidel Miner Blomgren Chellis & Gram, P. C.

Before DeVore, Presiding Judge, and Lagesen, Judge, and Duncan, Judge pro tempore.

**DUNCAN, J. pro tempore**

Petitioner seeks judicial review of a final order of the Land Use Board of Appeals (LUBA). In that order, LUBA remanded the City of Oregon City's decision to approve comprehensive plan map and zoning map amendments for Historic Properties, LLC property. LUBA's remand was based on its determination that the city's decision did not comply with Statewide Planning Goal 5. As relevant here, LUBA's order also sustained the city's determination that Historic Properties' application complied with Goal 2.3 (Corridors) of the Oregon City Comprehensive Plan (OCCP). On review, petitioner challenges LUBA's latter conclusion, asserting that LUBA erroneously deferred to the city's interpretation of Goal 2.3 and that that aspect of LUBA's order lacks substantial evidence to support it. Historic Properties, which filed a cross-petition for review, challenges LUBA's determination that the city's decision failed to comply with Goal 5. We conclude that the city's interpretation of Goal 2.3 is plausible and that petitioner's substantial evidence arguments do not provide a basis for this court to conclude that LUBA's order is "unlawful in substance" under ORS 197.850(9)(a). Except to the extent discussed below, we reject petitioner's other challenges and Historic Properties' challenge without further written discussion. Accordingly, we affirm.

## I. LEGAL CONTEXT

An amendment to the Oregon City zoning map or comprehensive plan map may be initiated by an application to the planning division. Oregon City Municipal Code (OCMC) 17.68.010. To approve such an application, the city must find that the requested amendment is consistent with the goals and policies of the OCCP. OCMC 17.68.020 (for zone changes); *see also Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 18, 569 P2d 1063 (1977) (holding that "when a comprehensive plan map is amended to change the permissible use of a single tract of land, without any change in the plan's underlying policies, the proponent of the change has the burden of proving that the change in the plan map is consistent with the goals and policies expressed in the plan as a whole"). One of those goals, Goal 2.3

(Corridors), provides that the city should "[f]ocus transit-oriented, higher intensity, mixed-use development along selected transit corridors."

The issues in this case pertain to whether LUBA correctly affirmed the city's determination that the proposed amendments met the requirements of Goal 2.3.

## II. PROCEDURAL HISTORY

The city approved Historic Properties' application to amend the comprehensive plan map and zoning map designations for its property, which is located at the intersection of Highway 213 and Beavercreek Road in Oregon City. As explained in LUBA's order, that decision

"change[d] the existing Low Density Residential and Medium Density Residential comprehensive plan map designations for [the property] to the Mixed Use Corridor (MUC) comprehensive plan map designation. The * * * decision also change[d] the existing R-3.5 Dwelling District, and R-6 and R-10 Single-Family Dwelling District zoning designations to the MUC-2 Mixed Use Corridor District zoning designation."

That is, the city approved a change of the property's comprehensive plan map designation to MUC, which, as the OCCP explains, provides for

"higher density mixed uses that are supportive of transit and conducive to pedestrian traffic. Urban density residential and commercial goods and services are typical uses. Zones in the Comprehensive Plan Land-Use Map district are intended to be compatible with Metro's Corridor design type."

And, the city approved a change of the property's zoning designation to MUC-2, which is described by OCMC 17.29.010:

"The Mixed-Use Corridor (MUC) District is designed to apply along selected sections of transportation corridors such as Molalla Avenue, 7th Street and Beavercreek Road, and along Warner-Milne Road. Land uses are characterized by high-volume establishments such as retail, service, office, multi-family residential, lodging, recreation and meeting facilities, or a similar use as defined by the community development director. A mix of high-density residential, office, and small-scale retail uses are encouraged in this District. Moderate density (MUC-1) and high

density (MUC-2) options are available within the MUC zoning district. The area along 7th Street is an example of MUC-1, and the area along Warner-Milne Road is an example of MUC-2."

The city based the approval, in part, on its determination that the proposed amendments, "with conditions of approval," complied "with the requirements of the [OCMC]" and with "the applicable Goal and Policies of the Oregon City Comprehensive Plan." With respect to Goal 2.3, the city determined that the application "[c]omplie[d] as [p]roposed." Specifically, the city found:

> "The subject site abuts a state Highway (OR 213), an arterial (Beavercreek Road), and is located near a transit stop. The proposed zoning designation is designed to be transit-oriented and focused near transportation corridors such as Beavercreek Road as identified in OCMC 17.29.010. This goal is met."

Petitioner and other individuals opposed to the amendments, who are not parties on review, appealed the city's decision to LUBA on a number of grounds. As relevant here, petitioner asserted in his first assignment of error that "the city's finding that the subject property is *near* a transit stop and transit corridor is insufficient to establish that it is *along* a transit corridor and transportation corridor, as required by OCCP Goal 2.3 and OCMC 17.29.010." (Emphasis in original.) Petitioner argued that the city "misconstrued" Goal 2.3 and made its decision "based on insufficient findings and without substantial evidence in the record."

LUBA rejected this challenge, reasoning that the term "along" is "sufficiently subjective that we cannot say [the city's] implicit interpretation that the subject property is sufficiently *near* the transit corridor to the northwest to satisfy OCCP Goal 2.3 is 'implausible.'" (Emphasis in original.)[1] As a result, LUBA denied petitioner's first assignment of error.

Petitioner thereafter sought review in this court.

---

[1] As explained below in greater detail, LUBA's order did not address petitioner's substantial evidence argument. *See* 286 Or App at 671-72.

## III. STANDARD OF REVIEW

This court reviews whether LUBA's order is "unlawful in substance or procedure[.]" ORS 197.850(9)(a).

## IV. ANALYSIS

On review, the parties do not dispute that Goal 2.3 provides an approval standard for the proposed amendments. As mentioned above, Goal 2.3 provides that the city should "[f]ocus transit-oriented, higher intensity, mixed-use development along selected transit corridors." The MUC comprehensive plan map designation and the MUC zoning district allow for such development and, consequently, are to be focused "along selected transit corridors." The parties dispute whether LUBA's order affirming the city's determination that the proposed amendments complied with that requirement was "unlawful in substance." In particular, the issues on review, as framed by petitioner, are (1) whether LUBA erroneously deferred to the city's interpretation of the phrase "along selected transit corridors," and (2) whether the portion of LUBA's order affirming the city's Goal 2.3 determination lacks substantial evidence to support it.

A. *Whether the City's Interpretation of Goal 2.3 was Entitled to Deference*

Petitioner asserts that LUBA erroneously deferred to the city's interpretation of Goal 2.3. He argues that the city was not entitled to deference because the city's interpretation is not plausible.[2]

---

[2] Petitioner also asserts that the city was not entitled to deference because the city interpreted standards set forth by Metro, a metropolitan service district encompassing land in Multnomah, Washington, and Clackamas counties including the city of Oregon City, rather than its own land use regulation. He argues that LUBA erred in deferring to the city's interpretation because that interpretation was not actually an "interpretation of its comprehensive plan," within the meaning of ORS 197.829(1) and, therefore, the city's interpretation is "not entitled to deference under the judicial rule that an agency is not entitled to deference in its interpretation of an enactment of another agency." We disagree. The city directly interpreted Goal 2.3, which is an enactment of the city. The text of Goal 2.3—"Focus transit-oriented, higher intensity, mixed-use development along selected transit corridors"—is the result of the deliberative process of the City Commission of Oregon City and is not found anywhere in the Metro provisions cited by petitioner. However, we agree with petitioner that those provisions provide relevant context for assessing the plausibility of the city's interpretation of Goal 2.3. *See* 286 Or App at 668 at n 4 (explaining why certain Metro provisions

LUBA's acceptance of the city's interpretation of its own comprehensive plan is "unlawful in substance" if it does not comply with ORS 197.829, which provides, in part:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan."

On review, this court "must determine *for itself* whether the interpretation underpinning [the city's] decision 'is inconsistent with the express language' of the provision * * * at issue." *Siporen v. City of Medford*, 349 Or 247, 262, 243 P3d 776 (2010) (emphasis in original). As we summarized in *Friends of the Hood River Waterfront v. City of Hood River*, 263 Or App 80, 88-89, 326 P3d 1229 (2014):

"Whether the city's interpretation of its comprehensive plan is inconsistent with the plan * * * 'depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993),] as modified by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).' *Setniker v. Polk County*, 244 Or App 618, 633-34, 260 P3d 800, *rev den*, 351 Or 216 (2011) (internal quotation marks omitted; brackets in original); *see also Mark Latham Excavation, Inc. v. Deschutes County*, 250 Or App 543, 552-53, 281 P3d 644 (2012) (same)."

In *Siporen*, the Supreme Court explained that, when "the interpretation is directed at a single term or statement," our task on review is to determine "whether the interpretation plausibly accounts for the text and context of the term or statement." 349 Or at 262. We focus our analysis of the plausibility of the city's interpretation: "[T]he existence of a stronger or more logical interpretation" does not render a "weaker or less logical interpretation 'implausible.'" *Siegert v. Crook County*, 246 Or App 500, 509, 266 P3d 170 (2011).

---

provide context for Goal 2.3); *id.* at 668 n 5 (discussing Metro's definition of "Corridors" as relevant context); *id.* at 669-70 (discussing Metro's 2040 Growth Concept text and map descriptions of Corridors as relevant context; rejecting petitioner's assertion that Metro Code (MC) 3.07.650(b) provides context).

Petitioner asserts that the city's interpretation "that the subject property is 'near a transit stop' is inconsistent with the express language 'along selected transit corridors' in Goal 2.3." In this case, whether "near a transit stop" is consistent with the express language "along selected transit corridors" is not dispositive because that is not the "interpretation" that the city made. In rejecting petitioner's contention, LUBA's order describes the city's Goal 2.3 findings as an implicit interpretation that a site "near" a transit corridor is within the scope of the phrase "along selected transit corridors" in Goal 2.3. However, the city also explained:

> "The subject site abuts a state Highway (OR 213), an arterial (Beavercreek Road), and is located near a transit stop. The proposed zoning designation is designed to be transit-oriented and focused near transportation corridors such as Beavercreek Road as identified in OCMC 17.29.010. This goal is met."

Based on the explicit text of the city's decision, we understand the city to have concluded that changing the property's comprehensive plan map and zoning map designations to MUC and MUC-2, respectively, satisfied the Goal 2.3 requirement that the transit-oriented, high intensity, mixed use development allowed by those designations be focused "along selected transit corridors," not only because the property is "near a transit stop" but also because the property "abuts" a state highway and an arterial.

In other words, we understand the city's interpretation to be that the scope of the phrase "along a transit corridor" is broad enough to include sites that abut, that is, are bordered by,[3] a state highway and an arterial and that are near a transit stop. *See Green v. Douglas County*, 245 Or App 430, 438, 263 P3d 355 (2011) (a reviewable interpretation must "identify and explain in writing the decisionmaker's understanding of the meaning of the local legislation" (quoting *Alliance for Responsible Land Use v. Deschutes County*, 149 Or App 259, 266, 942 P2d 836 (1997), *rev dismissed as improvidently allowed*, 327 Or 555 (1998))); *Siegert*, 246 Or

---

[3] "Abut" means "to border on." *Webster's Third New Int'l Dictionary* 8 (unabridged ed 2002).

App at 509 (explaining that one form of interpretation seeks to define the scope of an unclear term). For the reasons that follow, we conclude that that interpretation plausibly accounts for the text and context of Goal 2.3.

As noted above, Goal 2.3 states, "Focus transit-oriented, higher intensity, mixed-use development *along* selected transit corridors." (Emphasis added.) The natural reading of the goal's text indicates that the city should concentrate such development in an area that tracks both the location and direction of "transit corridors." As used in Goal 2.3, "along" is a preposition that can mean "over the length of (a surface);" "in the course of (as time or distance);" and "in a line parallel with the length or direction of." *Webster's Third New Int'l Dictionary* 60 (unabridged ed 2002). The adjective "parallel" can mean "extending in the same direction." *Id.* at 1637. These definitions imply both proximity between the locations of the "development" and "transit corridors" and an alignment of the orientation of the "development," and "transit corridors." It is plausible that a property bordered by a state highway and an arterial and located near a transit stop is within an area that tracks both the location and direction of a "transit corridor" in Oregon City.

Moreover, we conclude that the city's interpretation is consistent with the express language of Goal 2.3, considered in the context of the OCCP, specifically, the OCCP's references to "transit corridors" and "Corridors." The OCCP does not expressly define the term "transit corridors," but explains that "[t]ransit corridors are designated with the * * * Mixed Use Corridors (MUC) district to encourage somewhat more intensive and mixed-use development than exists, creating more efficient land-use and travel patterns" and that "[t]he MUC designation is intended to implement Metro's vision of the Corridor design type." Similarly, the OCCP explains that the "[z]ones in the [MUC] district are intended to be compatible with Metro's Corridor design type." These provisions indicate that the locations of "transit corridors" in the city are intended to be consistent with "Metro's Corridor design type." The OCCP glossary defines "design type" as "[c]onceptual areas in the *Metro 2040 Growth Concept* text and map." (Emphasis

in original.)[4] That definition also explains that some "Corridors" are "continuous, narrow bands of high-intensity development *along arterial roads*," while others are "a series of smaller centers at major intersections or other locations *along an arterial*." (Emphasis added.) Similarly, OCCP Policy 12.1.2 provides, "Continue to develop corridor plans *for the major arterials* in Oregon City, and provide appropriate land uses in and adjacent to those corridors to optimize the land use-transportation connection." (Emphasis added.) This context supports the city's interpretation that an "arterial" is an appropriate location for a transit corridor.[5]

We disagree with petitioner's assertion that, in context, the *only* plausible interpretation of the phrase "along selected transit corridors" is that the property must have a transit line running the full length of one of the segments of road that borders the property. Again, our task is not to determine whether petitioner's proposed interpretation is better than the city's, but rather, whether the city's interpretation itself plausibly accounts for the text and context of the phrase. *Siegert*, 246 Or App at 509. Moreover, nothing in the

---

[4] These references render Metro provisions that discuss the Corridor design type, and particularly those found in the Metro 2040 Growth Concept text and map, part of the context on the express language of Goal 2.3.

We also pause to provide background on the regional planning scheme embodied in the various provisions cited by petitioner. As the OCCP explains:

"In the mid-1990s, Metro adopted the *Regional Urban Growth Goals and Objectives* (RUGGO), which is part of the *Regional Framework Plan* (1997) and includes *Metro's 2040 Growth Concept* (1995). RUGGO was developed to implement regional compliance with state goals for land use in a coordinated way and to ensure that housing and employment growth could be accommodated equitably across the region."

(Emphasis in original.) Metro's 2040 Growth Concept explains that it "states the preferred form of regional growth and development" and that it includes the Growth Concept map. Metro adopted the Urban Growth Management Functional Plan, codified at Metro Code (MC) Chapter 3.07, to "implement [the policies in the RUGGO], including the Metro 2040 Growth Concept and the Regional Framework Plan." MC 3.07.010.

[5] As petitioner points out, the OCCP glossary definition of "Corridors" repeats "verbatim the text of an expanded definition of 'Corridors' *** in Metro's Regional Urban Growth Goals and Objectives. Metro Ord. 95-625A (1995)." Thus, Metro's own definition of "Corridors" also supports the city's interpretation that an "arterial" is an appropriate location for a transit corridor.

In addition, the OCCP also identifies Beavercreek Road as a "Corridor." It provides, "Molalla Avenue, 7th Street, Beavercreek Road, and Highway 99 are identified as Corridors[.]"

context that petitioner cites in support of his interpretation is inconsistent with the city's interpretation. Petitioner notes that the "corridor" definitions in the OCCP and Metro's 2040 Growth Concept state that a "corridor" is "[s]erved extensively by transit[,]" can be located "along an arterial that [has] * * * good transit service[,]" and is "[a]long good quality transit lines, * * * [with] convenient access to transit[.]" Those references to transit do not undermine the plausibility of the city's interpretation. Because the definitions do not further define the scope of any of these phrases, they can be understood to be prescriptive—descriptions of how areas that are designated· as corridors should develop—rather than prerequisites to the "corridor" or "MUC" designation.[6]

Petitioner correctly notes that the property is not designated as a "corridor" on Metro's 2040 Growth Concept map. However, we disagree with petitioner's contention that the city cannot designate a site as MUC unless it is along a "corridor" on the 2040 Growth Concept map or "along a duly-expanded Corridor pursuant to [Metro Code (MC)] 3.07.650(b)." Nothing in the 2040 Growth Concept text or map clearly precludes the city from designating a Corridor in a location other than the locations designated on Metro's 2040 Growth Concept map. In fact, as mentioned above, the Corridor description in the 2040 Growth Concept text supports the city's conclusion that an arterial road is an appropriate location for a transit corridor. Similarly, corridors that do appear on the 2040 Growth Concept also run along arterial roads. Additionally, petitioner's reliance on MC 3.07.650(b) is misplaced. Read in its own context, the provision applies to the revision of boundaries found on the "Centers, Corridors, Station Communities and Main Streets *Map*," which is a map that was adopted by Metro as part of the Urban Growth Management Functional Plan, and which is distinct from both the 2040 Growth Concept map

---

[6] Petitioner's argument presumes that designations are solely descriptive— that is, that they reflect existing conditions—as opposed to being prescriptive. That presumption is at odds with the role that the designations play in land use *planning*. As the OCCP explains, the MUC designation is intended to *encourage* particular types of changes; specifically, the plan states that "[t]ransit corridors are to be designated with the * * * Mixed Use Corridors (MUC) district to encourage somewhat more intensive and mixed-use development than exists, creating more efficient land-use and travel patterns."

and a local government's own comprehensive plan map. MC 3.07.650(a) (emphasis added).

Finally, we recognize that at the core of this dispute is petitioner's concern that

"[t]he Corridor comprehensive plan and zoning designation must be applied in a coordinated, if not simultaneous, manner to all of the properties creating the selected Corridor. That way, for example, the density of the formation can support the transit and the transit can support the density, in a synergistic manner. The subject property in this case, without transit, and isolated from other Corridor-designated properties, doesn't qualify for the applicable comprehensive plan and zoning designations. In isolation, its density level would be detrimental, for example by concentrating a high number of pedestrians who would have constrained options for mobility."

Assuming that corridor-related designations must be applied so that "the density of the formation can support the transit and the transit can support the density," petitioner's assertions that the property is "isolated" and "without transit" are issues of substantial evidence, which, as we will explain, petitioner did not adequately raise before LUBA. And, to the extent that petitioner's concern relies on the assumption that the city's interpretation was limited to concluding that any property "near a transit stop" satisfies the requirement of Goal 2.3 that the development be "along selected transit corridors," we reiterate that our holding is based on the broader understanding, as explained above, of the city's interpretation of "along selected transit corridors" to include properties that are both bordered by a state highway and an arterial and near a transit stop. We do not reach any conclusions as to whether proximity to a transit stop, by itself, is sufficient to establish that a property is "along selected transit corridors."

B. *Whether LUBA Made Findings of Fact that Were Not in the Record Below, and Sustained the City's Decision Despite a Lack of Substantial Evidence in the Whole Record*

Petitioner argues that LUBA erred "in making findings of fact that were not in the record below," asserting

that "LUBA's order is not supported by substantial evidence in the whole record as to facts found by the board under ORS 197.835(2). ORS 197.850(9)(c)." As an initial matter, petitioner misstates the standard of review; LUBA did not find facts under ORS 197.835(2).[7]

However, we also understand petitioner to argue that LUBA's order is "unlawful in substance" because there is no evidence to support the city's finding that the application complied with Goal 2.3. ORS 197.850(9)(a). Specifically, petitioner asserts that "[i]rrespective of whether * * * the subject site is 'along a transit corridor' or 'near a transit stop,' the record below is completely devoid of *any* evidence to substantiate any finding." (Emphasis in original.) We decline to address petitioner's argument. Petitioner did not make this argument before LUBA, and, as a result, has not preserved the issue, as now framed, for our review. *See* ORS 197.850(8) ("Judicial review of an order issued under ORS 197.830 to 197.845 shall be confined to the record."). Moreover, LUBA did not make any substantial evidence rulings on the Goal 2.3 issue in its order.

Before LUBA, petitioner's only substantial evidence argument relied on the conclusion that Goal 2.3 requires land designated as MUC to be "along a good quality transit line." Petitioner argued:

"Respondent's findings fail to establish that the subject property meets the standard for the Mixed Use Corridor OCCP designation or the MUC zoning designation: the property is simply not 'along' a good quality transit line. * * * For the subject property to satisfy the standard for the 'Mixed Use Corridor' comprehensive plan designation or the MUC zoning designation, it would have to have a good

---

[7] Under ORS 197.850(9)(c), this court shall reverse or remand LUBA's order if it finds that "[t]he order is not supported by substantial evidence in the whole record as to facts found by the board under ORS 197.835(2)." ORS 197.835(2) provides, in relevant part, that LUBA "may take evidence and make findings of facts on" disputed allegations of "standing, unconstitutionality of the decision, *ex parte* contacts, actions described in subsection (10)(a)(B) of this section or other procedural irregularities not shown in the record that, if proved, would warrant reversal or remand[.]" Before LUBA, there were no disputed procedural issues under petitioner's assignment of error that required LUBA to make findings of fact. Additionally, the "facts" that petitioner asserts that LUBA erroneously found were statements made in footnotes, which, read in context, were not relied on by LUBA in making its rulings on the assignment of error.

quality bus line running on the segment of Beavercreek Road along—paralleling—the property, from Highway 213 to Maplelane Road, or on the segment of Maplelane Road running from Beavercreek Road to Maplelane Court. The subject property has neither. * * *

"There is also no evidence in the record that these segments ever will be served by 'good quality' transit in the future[.]"

(Footnote omitted.) That is, petitioner's arguments were contingent on LUBA's rejection of the city's interpretation of Goal 2.3 and on LUBA's adoption of his alternative interpretation. LUBA found that the city's interpretation was entitled to deference under ORS 197.829(1)(a) and, therefore, did not address this argument. As we summarized in *Root v. Klamath County*, 260 Or App 665, 670, 320 P3d 631 (2014), when a petitioner asserts a substantial evidence issue under ORS 197.850(9)(a),

"our role * * * is to ensure that LUBA has followed the proper 'substantial evidence' standard in reviewing the county's decision. * * * Our task is not to assess whether the local government erred in making a finding, but to determine whether LUBA properly exercised its review authority."

(Brackets and some internal quotation marks omitted.) Because LUBA did not exercise its review authority, there is nothing for us to review.

## V.  CONCLUSION

The city's interpretation of Goal 2.3 plausibly accounts for the text and context of the goal, and, therefore, LUBA did not err in deferring to that interpretation.

Affirmed on petition and cross-petition.