Argued and submitted May 5, on petition, reversed and remanded for reconsideration of transportation planning rules mitigation requirements; otherwise affirmed; on cross-petition, affirmed August 3, petition for review denied October 6, 2011 (351 Or 216)

David SETNIKER
and Joan Setniker,
*Petitioners
Cross-Respondents,*
*and*

RICKREALL COMMUNITY WATER ASSOCIATION;
Madjic Farms, Inc.;
Michael S. Calef; Susan D. Calef;
and E. M. Easterly,
*Respondents,*

*v.*

POLK COUNTY
and CPM Development Corporation,
*Respondents
Cross-Petitioners.*

Land Use Board of Appeals
2010057; A148070

160 P3d 800

William H. Sherlock argued the cause for petitioners - cross-respondents. With him on the briefs were Zack Mittge and Hutchinson, Cox, Coons, DuPriest, Orr & Sherlock, P.C.

Wallace Lien argued the cause for respondent - cross-petitioner CPM Development Corporation. With him on the joint brief was David Doyle for respondent - cross-petitioner Polk County.

No appearance for respondents Rickreall Community Water Association, Madjic Farms, Inc., Michael S. Calef, Susan D. Calef, and E. M. Easterly.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

CPM Development Corporation seeks to develop a sand-and-gravel operation on property adjacent to farmland owned by petitioners in Polk County. In pursuing that development, CPM submitted a three-part application to the county, and the county approved it. Petitioners appealed the county's decision to LUBA. LUBA rejected most of petitioners' assignments of error but remanded to the county on others. *Rickreall Community Water Assoc. v. Polk County*, 53 Or LUBA 76 (2006) (*Rickreall I*). Petitioners sought judicial review, and we affirmed without an opinion. *Rickreall Community Water Assoc. v. Polk County*, 212 Or App 497, 158 P3d 524 (2007). On remand, the county again approved CPM's application. Petitioners again appealed to LUBA, and LUBA rejected most of the assignments of error, ruled for petitioners on others, and again remanded the application to the county. Petitioners now seek review of that latest LUBA decision, assigning error to LUBA's rejection of some of their arguments; CPM cross-petitions on the ground that LUBA erred in sustaining certain of petitioners' other assignments. For the reasons explained below, we affirm LUBA's decision in part, reverse in part, and remand.[1]

We take the facts, which are undisputed, from LUBA's opinion. CPM proposed a sand-and-gravel extraction and processing facility, as well as a cement and asphalt processing plant, on part of a parcel zoned exclusively for farm use. The site is located approximately two miles north of the City of Independence, just west of the Willamette River. Petitioners, the Setnikers, own property adjacent to the parcel.

The issues in this case involve the intersection of Oregon State Highway 51, which runs north and south, with Oregon State Highway 22, which runs east and west. The 51/22 intersection is controlled by stop signs on the northbound and southbound approaches only; Highway 22 is a through road, five lanes wide. Westbound vehicles on Highway 22 seeking access to the site must use the middle turn lane on Highway 22 (which has no traffic signal) to turn

---

[1] Rickreall Community Water Association, Madjic Farms, Inc., Michael and Susan Calef, and E.M. Easterly intervened as petitioners before LUBA. These parties have not appeared on judicial review.

south onto Highway 51, then travel a relatively short distance to the intersection where Highway 51 meets a haul road, and then turn left (east) onto the haul road to the site.

In 2001, CPM filed an application with the county for (1) a comprehensive plan amendment to add the site to the county's inventory of significant mineral and aggregate resources; (2) a zoning map amendment to add a mineral and aggregate (MA) overlay zone to the mining site and surrounding area, totaling 336 acres; and (3) a conditional use permit to mine the site. After various delays requested by CPM, the county board of commissioners approved all three elements of the application in 2006. That approval was appealed to LUBA, and in *Rickreall I*, LUBA remanded the decision to the county after sustaining some assignments of error and rejecting others. As relevant here, the bases for remand included the county's failure to apply the county procedures and code standards applicable to the proposed comprehensive plan amendment and failure to demonstrate compliance with the Transportation Planning Rule (TPR) at OAR 660-012-0060, set out below.

In March 2009, the county planning commission held an evidentiary hearing to address the correct code standards for the comprehensive plan amendment. The remaining bases for remand were reserved for action by the board of commissioners. In June 2009, the planning commission recommended that the board of commissioners approve the requested plan amendment and, after an evidentiary hearing, the commissioners did so, issuing an ordinance that again approved CPM's three-part application. Petitioners once again appealed to LUBA.

As relevant to the petition before this court, petitioners argued to LUBA that the county erred in four respects: (1) by misapplying the TPR; (2) by considering new evidence without reopening the record to petitioners; (3) by allowing respondent to process aggregate to be extracted from another site, contrary to ORS 517.750(11) and Polk County Zoning Ordinance (PCZO) 174.050; and (4) by not weighing the benefits and impacts of a new mining site as required by PCZO 115.060(C). LUBA rejected all of petitioners' assignments of

error except the error addressing the TPR, which LUBA sustained in part. Petitioners and CPM both seek judicial review. CPM argues that LUBA erred in evaluating its application based on laws and rules that were in effect at the time that the county ruled on its application, instead of laws and rules in effect when CPM originally submitted the application. Petitioners, for their part, argue that LUBA misapplied the TPR by not requiring the county to put in place more measures to mitigate the effects of CPM's proposed operation; that LUBA did not address all of their arguments; and that LUBA erred by upholding a plan amendment and zone change that allow CPM to process aggregate extracted off site. We hold that (1) LUBA correctly ruled that the appropriate legal standards were the ones in effect when the county ruled on CPM's application, and not those in effect when CPM originally submitted the application; (2) LUBA misinterpreted the TPR's mitigation requirements; and (3) LUBA correctly ruled in favor of CPM's proposal to process aggregate extracted off site. Therefore, on petitioners' petition for review, we affirm in part, reverse in part, and remand. On CPM's cross-assignments of error, we affirm.[2]

We address each assignment of error in turn, beginning with CPM's cross-assignment regarding the TPR because our resolution of that issue determines how we address petitioners' argument regarding application of the same rule.

CPM's argument deals with the interaction between the TPR and the so-called "goal-post rule," ORS 215.427(3)(a). Under OAR 660-012-0060(1)(c) of the TPR, if a local government's amendment to a comprehensive plan or land use regulation "significantly affects" a transportation facility—and the 51/22 intersection is a transportation facility—the local government may approve the amendment only if it also adopts one or more of the mitigating measures described in OAR 660-012-0060(2) or OAR 660-012-0060(3).

---

[2] Petitioners also assign error to LUBA's failure to require the county to disregard evidence that petitioners allege they did not have the opportunity to rebut, and to LUBA's alleged failure to engage in a proper balancing test in order to reach the conclusion that the project would confer a general public benefit. We reject all of those assignments of error without discussion.

An amendment "significantly affects" a transportation facility if it degrades the facility "[a]s measured at the end of the planning period identified in the adopted transportation system plan." OAR 660-012-0060(1)(c).

The "goal-post rule," ORS 215.427(3)(a), provides, in essence, that the rules in existence when an application is complete are the rules that govern the approval or rejection of the application—government, in other words, cannot "move the goal-posts" after the applicant has (to complete the sport metaphor) kicked the ball:

> "If the application [for a permit, limited land use decision or zone change] was complete when first submitted or the applicant submits additional information * * * within 180 days of the date the application was first submitted and the county has a comprehensive plan and land use regulations acknowledged under ORS 197.251, approval or denial of the application shall be based upon the standards and criteria that were applicable at the time the application was first submitted."

Thus, in this case, if the goal-post rule applies, then the degradation is measured as of the end of the planning period that was in effect when CPM first submitted the application in 2001. That date was 2020. If the goal-post rule does not apply, then, because the county has adopted a new transportation system plan with a 2030 horizon, projected impacts are measured as of that later date. CPM apparently believes that, if the appropriate date for measuring impacts is 2020— that is, if the goal-post rule does apply—then the TPR does not come into play at all and no mitigation measures are necessary, because as of 2020 there will not be any "significant effects" on the 51/22 intersection. Petitioners, for their part, argue that the goal-post rule does not apply; therefore, the appropriate date for measuring impact is 2030, and, by that time, the CPM project *will* have a "significant effect[ ]," and consequently the county must meet the mitigation requirements.

The county, on remand, concluded that the goal-post rule applied to CPM's application and applied the 2020 planning horizon. On appeal to LUBA, petitioners argued that the goal-post rule does not apply to a zone change or a permit

application that is consolidated with and dependent upon a simultaneous comprehensive plan amendment. In response, CPM argued that, by its plain language, the goal-post rule does apply.

LUBA agreed with petitioners, concluding:

"[I]n applying OAR 660-012-0060(1)(c), the county was required to determine whether the plan and zoning amendments significantly affect transportation facilities '[a]s measured at the end of the planning period identified in the adopted transportation system plan,' *i.e.* the 2009 TSP [Transportation System Plan], which has a planning period of 2030."

Now, in its cross-petition, CPM assigns error to LUBA's conclusion. CPM argues that LUBA erred in concluding that the goal-post rule does not apply to zone changes or permit applications that are consolidated with a comprehensive plan amendment and, in doing so, ignored the plain language of the statute.[3] We agree with LUBA.

In *Rutigliano v. Jackson County*, 42 Or LUBA 565, 572 (2002), LUBA discussed how the goal-post rule applies to a consolidated application where a zone change is dependent upon a plan amendment. LUBA explained,

"ORS 215.427 is almost entirely directed at requiring counties to render a final decision on an 'application for a permit, limited land use decision or zone change' within 150 days. The fixed goal post rule is appended to a comprehensive statute that is almost entirely directed at ensuring that three kinds of land use applications receive a final decision within 150 days. The usual situation that the legislature envisioned in adopting and amending ORS 215.427 over the years is an 'application for a permit, limited land use decision or zone change' that is already anticipated by the acknowledged comprehensive plan and land use regulations and therefore requires no post-acknowledgement comprehensive plan or land use regulation amendment.

---

[3] In CPM's first assignment of error on cross-petition, it argues that LUBA erred in suggesting that the TPR applied to the plan text amendment. However, LUBA held that the TPR, whether or not it applied to the plan text amendment, nevertheless applied to respondent's request for a zone change. CPM does not challenge that decision, which is an independent basis for rejecting CPM's argument. Accordingly, we reject this assignment of error.

"However, ORS 215.427 also embodies a second important principle. Where the acknowledged comprehensive plan or land use regulations do not anticipate the 'application for a permit, limited land use decision or zone change' and the acknowledged comprehensive plan or land use regulation must be amended to allow the application to be approved, the 150-day deadline does not apply. ORS 215.427(6) makes it clear that the 150-day deadline does not apply to an 'application for a permit, limited land use decision or zone change,' in that circumstance. *Edney v. Columbia County Board of Commissioners*, 318 Or [138, 143-44, 863 P2d 1259 (1993)]. To the extent that ORS 215.427(6) leaves anything to the imagination concerning whether the 150-day deadline might apply to an 'application for a permit, limited land use decision or zone change,' ORS 215.427(8) expressly provides that the 150-day deadline does not apply where such applications require a concurrent comprehensive plan amendment.

"* * * * *

"We conclude that where a county has a unified zoning and comprehensive plan map, such that the zoning map cannot be amended without that amendment being *both* a 'comprehensive plan change' and a 'zone change,' the fixed goal post rule does not apply. Our reason for reaching that conclusion is simple. The 'application[s]' that are subject to the fixed goal post rule of ORS 215.427(3) are the same 'applications for a permit, limited land use decision or zone change' that are subject to the 150-day deadline of ORS 215.427(1). If the legislature had intended to make combined applications for both comprehensive plan map amendments and zoning map amendments subject to the fixed goal post rule, it could have said so. No plausible argument has been presented in this appeal for construing the term 'zone change' broadly enough to include a change to a unified map that is *both* a zoning map and comprehensive plan map. * * * While the application at issue seeks a 'zone change,' that is not all it seeks. Because [the] petitioner's application seeks more than a 'zone change,' it is not limited to one or more of the three kinds of land use applications described in ORS 215.427(1) and is not subject to the fixed goal post rule."

*Id.* at 572-75 (emphases in original; footnotes omitted). We agree with LUBA's analysis and reasoning—in a nutshell,

the goal-post rule does not apply when the standards that it requires to remain fixed are themselves bound up with the application. Accordingly, we reject CPM's cross-petition and agree that the goal-post rule does not apply to a zone change or permit application that is consolidated with, and dependent upon, a comprehensive plan amendment. Thus, the relevant date for determining whether the county's proposed amendment would significantly affect the intersection is 2030.

We now turn to petitioners' assignments of error on judicial review, the first of which challenges LUBA's application of the TPR. Because the county found that respondent's proposed application would "significantly affect" a transportation facility as of 2030, OAR 660-012-0060(1), the county imposed two conditions of approval intended to ensure that traffic from the proposed development would not render the 51/22 intersection "[in]consistent with [its] identified function, capacity, and performance standards." The first condition prohibited CPM's employees and contract haulers that travel west on Highway 22 from turning south onto Highway 51 at the intersection between 4:00 and 6:00 p.m. and, instead, required them to use an eight-mile long alternate route. The second condition, intended to discourage haulers from violating the first condition, required CPM to erect a gate or chain across the entrance to the haul road from Highway 51 between 4:00 and 6:00 p.m. The gate or chain would not physically prevent a determined hauler from entering the site, but it would make entry more difficult.

To LUBA, petitioners argued, among other things not at issue before us, that the rerouting and chaining conditions did not constitute sufficient or permissible mitigation under the TPR. That rule provides:

"(1) Where an amendment to a functional plan, an acknowledged comprehensive plan, or a land use regulation would significantly affect an existing or planned transportation facility, the local government shall put in place measures as provided in section (2) of this rule to assure that allowed land uses are consistent with the identified function, capacity, and performance standards * * * of the facility. * * *

"* * * * *

"(2)   Where a local government determines that there would be a significant effect, compliance with section (1) shall be accomplished through one or a combination of the following:

"* * * * *

"(e)   Providing other measures as a condition of development or through a development agreement or similar funding method, including transportation system management measures, demand management or minor transportation improvements. Local governments shall as part of the amendment specify when measures or improvements provided pursuant to this subsection will be provided.

"(3)   Notwithstanding sections (1) and (2) of this rule, a local government may approve an amendment that would significantly affect an existing transportation facility without assuring that the allowed land uses are consistent with the function, capacity and performance standards of the facility where:

"(a)   The facility is already performing below the minimum acceptable performance standard identified in the TSP [Transportation System Plan] or comprehensive plan on the date the amendment application is submitted;

"(b)   In the absence of the amendment, planned transportation facilities, improvements and services as set forth in section (4) of this rule would not be adequate to achieve consistency with the identified function, capacity or performance standard for that facility by the end of the planning period identified in the adopted TSP;

"(c)   Development resulting from the amendment will, at a minimum, mitigate the impacts of the amendment in a manner that avoids further degradation to the performance of the facility by the time of the development through one or a combination of transportation improvements or measures[.]"

OAR 660-012-0060. Petitioners' argument, if we understand it correctly, begins with the undisputed (at this stage of the case) premise that the amendments sought by CPM will "significantly affect" the 51/22 intersection, presumably by increasing the number of westbound vehicles that would

make left turns off of Highway 22 on to Highway 51, and that, therefore, the county can meet the requirements of the TPR rule only by complying with either subsections (1) and (2)(e), or subsection (3). Subsections (1) and (2)(e), petitioners contend, require the county to undertake "measures" that will "assure that [the land uses proposed in CPM's application] are consistent with the identified function, capacity, and performance standards" of the 51/22 intersection. In other words, petitioners argue—and this is the key to their argument—subsections (1) and (2)(e) require the rerouting and entrance blocking to mitigate not only the intersection's failures caused by CPM's proposed site, but also eliminate any failures that the intersection already has or will encounter without the proposed site, that is, failures caused by existing traffic and so-called "background traffic" growth. Therefore, the argument continues, because the rerouting and blocking will at best offset the impacts of CPM's proposed development but will not bring the presently failing or project-to-fail intersection into full consistency with its function, capacity and performance standards, CPM's only option is subsection (3), which *does* permit measures that will mitigate only the failures caused by the proposed site. And, the argument goes, it is undisputed that CPM cannot meet one of the conjunctive requirements in subsection (3), namely, (3)(a) ("[t]he facility is already performing below the minimum acceptable performance standard identified in the TSP or comprehensive plan on the date the amendment application is submitted"), because the 51/22 intersection was *not* failing when CPM's application was first submitted in 2001. Thus, petitioners conclude, the county cannot possibly achieve compliance with the TPR without imposing additional mitigation measures that will not only mitigate the effects of CPM's project, but will also mitigate the existing and projected failures that are independent of that project.

LUBA rejected petitioners' argument:

"Where petitioners go astray is in their apparent understanding that OAR 660-012-0060(2)(e) requires the applicant to provide 'other measures as a condition of development' sufficient to mitigate even failures caused solely by growth in the background traffic. The basic commandment

of OAR 660-012-0060(1) and (2) is to ensure that the *proposed amendment* is 'consistent with' the function, capacity and performance standards of transportation facilities. If conditions of approval are sufficient to completely mitigate or eliminate impacts from the proposed amendment on a facility that is projected to fail, then the amendments will not 'worsen' the projected failure for purposes of OAR 660-012-0060(1)(c) and the TPR is satisfied, notwithstanding that the facility is failing or will still fail by the end of the planning period due to growth in background traffic. In short, OAR 660-012-0060(2)(e) and (3) work together to provide means to ensure that the proposed amendment is 'consistent with' the function, capacity and performance standards of the facility, and the two provisions are neither mutually exclusive nor subject to some kind of gap in their coverage."

(Emphasis in original.) LUBA's rejection of the key part of petitioners' argument ("OAR 660-012-0060(2)(e) requires the applicant to provide 'other measures as a condition of development' sufficient to mitigate even failures caused solely by growth in background traffic") is not persuasive. LUBA relies on "the basic command" of the TPR and, apparently, a reluctance to interpret the rule so as to create a "gap": under petitioners' interpretation of the rule, if an amendment will have a significant impact on a facility that was performing at an acceptable level when the application was submitted but becomes unacceptable within the transportation system plan's time frame (here, 2030) due to naturally occurring growth in background traffic, the local government must require conditions that not only mitigate the damage caused by the amendment but also remedy the facility's failures for which the amendment is in no way responsible.

Although LUBA's reading may make more sense and may, in fact, correct a flaw that the rule's drafters inadvertently overlooked, the reading simply cannot be reconciled with the rule's unambiguous language. Subsections (1) and (2)(e) require measures that ensure a facility's consistency with its function, capacity, and performance standards, that is, that ensure that the facility will not fail. Subsection (3) creates an exception: "Notwithstanding sections (1) and (2)," the local government does *not* have to require measures ensuring that the facility is in compliance with standards,

etc., *if* the facility was already out of compliance when the application was filed, it would be out of compliance by the end of the planning period in the transportation system plan, and the amendment will itself mitigate its own adverse impact.

In sum, LUBA erred in ruling that the county could comply with subsection (2)(e) of the TPR by mitigating only CPM's significant adverse effects. As the rule is written, *if* LUBA decides on remand that (1) the 51/22 intersection was consistent with relevant function, capacity, and performance standards when CPM filed its application, and (2) the intersection will become inconsistent with the relevant function, etc., by 2030, due to the effect of the amendments *or* due to independent growth or background traffic, then the county must put in place measures that will not only mitigate the inconsistencies caused by the amendments but also the inconsistencies resulting independently.

Petitioners argue in their second assignment of error that LUBA's treatment of the rerouting measure failed to address all of the extra trips created by the development, instead addressing only those from CPM's employees and independent contractors, and that, in any event, the rerouting measure was neither feasible nor enforceable. Petitioners cite ORS 197.835(11) for the proposition that LUBA was required to address the argument petitioners made to it, namely, that CPM's rerouting of its trucks does not address the effect of vehicles driven by "suppliers, customers, and visitors." ORS 197.835(11)(a) provides, in part:

> "Whenever the findings, order and record are sufficient to allow review, and to the extent possible consistent with the time requirements of ORS 197.830(14), the board shall decide all issues presented to it when reversing or remanding a land use decision * * * or limited land use decision * * *."

As noted earlier, the county imposed two conditions of approval on CPM to ensure that traffic from the proposed development would not worsen or degrade the functionality of the 51/22 intersection: rerouting CPM's trucks during peak hours and placing a gate to discourage truckers from using the intersection during those hours. To LUBA, petitioners

argued, among other things, that the proposed rerouting condition did not include all trips arriving at the subject site because it did not include trips made by "suppliers, customers, and visitors." We disagree. The county explicitly found,

> "Independent trucks that haul from the new facility are also controlled by mandatory routing. To ensure compliance with the routing plan, a data sheet would be used for all drivers and *visitors* instructing them on appropriate routing, and particularly to not make the southbound turning movement at the 51/22 intersection. The applicant states that independent drivers who are discovered to have violated the mandatory routing would be subject to having access privileges revoked. * * *

> "The applicant states that the mandatory routing plan would also apply to employees and *suppliers* of the proposed facility. * * *"

(Emphasis added.) The county's order plainly took into consideration the "suppliers, customers, and visitors."

Petitioners next argue that the county erred in allowing aggregate that is extracted off site to be processed at the subject property. Specifically, petitioners argue that LUBA erred in upholding the county's interpretation of PCZO 174.050. That ordinance provides:

> "The following uses may be permitted in the MA Extraction Area subject to Site Plan approval * * *:

> "(A)  Mining or extraction of rock, clay, soil, sand, gravel, or other mineral or aggregate material.

> "(B)  Stockpiling and storage of mineral and aggregate materials.

> "(C)  Processing of:

> "(1)  Materials, including crushing, washing, milling, screening, sizing, batching of portland cement; and

> "(2)  Batching or blending of mineral and aggregate into asphaltic concrete, except within 2 miles of a planted commercial vineyard.

> "* * * * *

> "(G)  Sale of products extracted and processed on-site from a mineral and aggregate operation."

Petitioners focus on subsection (G), and argue that the necessary implication of that subsection is that, because the *sales* permitted on site are limited to products that are extracted and processed on site, no processing of products extracted off site is permitted. The logical flaw in that argument is readily apparent: subsection (G) neither says nor implies anything about products that are extracted off site, hauled to the site, processed on site, then hauled and sold off site. LUBA noted as much: "[W]e agree with respondents that [PCZO 174.050(G)] authorizes a limited commercial use within the MA zone, but is probably not intended to proscribe on-site processing of material that was extracted off-site, where that material is then sold to customers off-site." In light of subsection (C), which expressly authorizes on-site processing, petitioners' argument is hardly plausible.[4]

Nor is their argument helped by ORS 517.750(11), which provides:

> " 'Processing' includes, but is not limited to, crushing, washing, milling and screening as well as the batching and blending of mineral aggregate into asphalt and portland cement concrete located within the operating permit area."

Petitioners would read the phrase "within the operating permit area" to somehow limit the definition of "processing" so as to require that the term apply only to operations taking place within the site where extraction occurred. In fact, the statute says nothing about extraction or any connection between extraction and processing.

Whether a local government's interpretation of its land use regulation is "inconsistent with the express language" of the regulation under ORS 197.829(1)(a) " 'depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993),]' " as modified by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). *Western Land & Cattle, Inc. v. Umatilla County*,

---

[4] Perhaps to avoid this conclusion, petitioners insist that it is "reasonable and likely that a significant percentage of aggregate will be sold [on site] * * * that has been mined off-site." When and if that occurs, we may be called on to decide whether subsection (G) prohibits such sales. At present, we are not.

230 Or App 202, 209, 214 P3d 68 (2009) (quoting *Foland v. Jackson County*, 215 Or App 157, 164, 168 P3d 1238, *rev den*, 343 Or 690 (2007)). As the Supreme Court recently explained, "when a governing body is responsible for enacting an ordinance, it may be assumed to have a better understanding than LUBA or the courts in its intended meaning." *Siporen v. City of Medford*, 349 Or 247, 258, 243 P3d 776 (2010). Under these standards, we readily conclude that the county's interpretation of PCZO 174.050 cannot be rejected.

On petition, reversed and remanded for reconsideration of transportation planning rules mitigation requirements; otherwise affirmed. On cross-petition, affirmed.