Argued and submitted March 16, reversed in part and remanded June 7, 2023

BOTTS MARSH LLC,
*Respondent,*

*v.*

CITY OF WHEELER,
*Petitioner.*

Land Use Board of Appeals
2022079; A180520

532P3d 544

The City of Wheeler denied applicant's application for design review of a proposed development on applicant's property. The Land Use Board of Appeals (LUBA) reversed the denial and remanded for the city to reopen the record to give applicant an opportunity to submit additional materials and respond to the city's newly articulated interpretations of its design-review standards. The city seeks judicial review, raising three assignments of error. *Held*: As to the first two assignments, the Court of Appeals concluded that, in these circumstances, LUBA did not err in remanding for the city to reopen the record. As to the third assignment, the Court of Appeals concluded that LUBA did not err in deciding that the city's interpretations of the avoid-monotony and view-impact standards were implausible under *Siporen v. City of Medford*, 349 Or 247, 243 P3d 776 (2010), but that LUBA erred in rejecting part of the city's interpretation of the primary-entrance standard.

Reversed in part and remanded.

William K. Kabeiseman argued the cause for petitioner. Also on the brief was Bateman Seidel Miner Blomgren Chellis & Gram, P.C.

Jennie L. Bricker argued the cause for respondent. Also on the brief were Land Shore Water Legal Services, LLC, and Reilley D. Keating, Sarah Stauffer Curtiss, and Stoel Rives, LLP.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Reversed in part and remanded.

**AOYAGI, P. J.**

The City of Wheeler denied applicant's application for design review of a proposed development on applicant's property. The Land Use Board of Appeals (LUBA) reversed the denial and remanded for the city to reopen the record to give applicant an opportunity to submit additional materials and respond to the city's newly articulated interpretations of its design-review standards. The city seeks judicial review, raising three assignments of error. As to the first two assignments, we conclude that, in these circumstances, LUBA did not err in remanding for the city to reopen the record. As to the third assignment, we conclude that, with respect to the three design-review standards at issue on judicial review, LUBA did not err in concluding that the city's interpretations of the avoid-monotony and view-impact standards were implausible under *Siporen v. City of Medford*, 349 Or 247, 243 P3d 776 (2010), but did err in rejecting part of the city's interpretation of the primary-entrance standard. Accordingly, we reverse as to the primary-entrance standard and otherwise affirm.

FACTS

We take the facts, which are undisputed, from LUBA's opinion.

"[Applicant's] property is located west of Highway 101 and east of the Nehalem River. Botts Marsh, an intertidal wetland adjacent to Nehalem Bay, is located to the north. To the south is vacant land, and to the north is property located outside of the city limits. The property is comprised of two parcels, with a .45-acre parcel zoned Industrial (I), and a 1.72-acre parcel zoned Water Related Commercial (WRC). Wheeler Zoning Ordinance (WZO) 2.020(7) provides that 'retail/wholesale fish and shellfish sales' is a permitted use in the WRC zone, and WZO 3.020(7) provides that 'seafood processing' is a permitted use in the I zone. However, WZO 11.050(1) provides that "all commercial and industrial development in any zone *** is subject to design review by the [p]lanning [c]ommission.""

(Brackets in original, except first brackets added; footnote omitted.)

In 2021, applicant applied for design review for a building for the processing, storage, and retail sale of fish and shellfish. As LUBA explained,

"The project is in two distinct parts. An 8,780 square foot fish processing and warehousing facility will be located entirely on [the] Industrial zoned portion of the site. *** Attached to this structure, and located entirely within the WRC zoned portion of the site, will be a 1,500 square foot retail market. This part of the structure includes a second floor to be used as an office and for storage."

(Brackets in original; internal quotation marks omitted.)

"The city manager and city planner prepared a staff report that evaluated the building's compliance with the design review criteria in WZO 11.050, and recommended approval of the application.

"On September 23, 2021, the planning commission held a hearing on the application, and at the conclusion, continued the hearing to October 7, 2021, and kept the record open for new evidence and rebuttal. Prior to the October 7, 2021 hearing, [applicant] submitted additional materials to address comments from the public at the first planning commission hearing. At the conclusion of the continued hearing on October 7, 2021, the planning commission voted three in favor and three opposed, with one planning commissioner abstaining after declaring that they had a conflict of interest. The parties agree that a tie vote is the equivalent of denial by the planning commission. ***.

"[Applicant] appealed the planning commission decision to the city council, which held a *de novo* hearing on the application on November 16, 2021. The city planner provided a staff report that recommended approval of the application. Some members of the public testified that they believed the uses proposed for the building should not be allowed because they are not 'water-related.' Two members of the planning commission testified in opposition to the application. One member of the public testified that the design of the parking lot created a safety hazard. During deliberations on the application, two city council members also expressed concern that the proposed use of the building was not 'water-related.'

"At the conclusion of the hearing, the city council voted three to two to deny the application. After the vote, the city's planner advised the city council that the city was required to supply reasons for its denial, and recommended that the city planner draft proposed findings in support of the decision to deny the application based on their review of the meeting recording, for the city council to review at its next meeting.

"At its December 15, 2021 meeting, the city council adopted a written decision, including findings that the city planner prepared after the November 16, 2021 hearing. The decision concluded that [applicant's] application failed to satisfy five of the design review criteria, WZO 11.050 (4)(a)(6), 11.050(4)(b)(l), (2), (3) and (5)."

(Internal citations omitted.) Thus, after a city council meeting at which there was no discussion of how to interpret the design-review standards, the city issued a final written order denying the application based on newly announced interpretations of the city's design-review standards that differed from those implicit in the city staff's draft findings.

Applicant appealed to LUBA. LUBA ruled that the city was required, and had failed, to adopt findings "sufficient to inform [applicant] of the nature and types of changes in the proposal that will be necessary to obtain approval, that is, sufficient to avoid [applicant] 'having [its] success or failure determined by guessing under which shell lies the pea.'" *Botts Marsh, LLC v. City of Wheeler*, ___ Or LUBA ___ (LUBA No 2022-002, May 11, 2022) (slip op at 39) (*Botts Marsh I*) (quoting *Commonwealth Properties, Inc. v. Washington County*, 35 Or App 387, 399, 582 P2d 1384 (1978) (*Commonwealth*) (first brackets added)). LUBA also noted its assumption that, on remand, the city would communicate with applicant about the necessary changes to the application and reopen the record: "We also assume, as the court assumed in *Commonwealth*, that 'in many instances planning authorities will communicate, at least preliminarily, much of this information to [applicants] on an informal basis prior to the hearing.'" *Id.* at (slip op at 30 n 8) (quoting *Commonwealth*, 35 Or App at 400).

On remand, the city denied applicant's requests to reopen the record to provide evidence or argument, further

interpreted its design-review standards, and again denied the application for failure to demonstrate compliance with the design-review standards. Applicant again appealed to LUBA.

On the second appeal, LUBA concluded that five of the city's new interpretations of its standards were implausible and did not comply with the standard set out in *Commonwealth*. It also concluded that the city's failure to provide applicant with any opportunity to submit evidence or argument to respond to the city's evolving interpretations of its design-review standards was procedurally unfair, and it remanded with express instructions for the city to reopen the record in the proceedings on remand.

The city seeks judicial review, asserting that LUBA erred by (1) addressing a procedural-fairness argument that, in the city's view, applicant did not make to LUBA, (2) remanding for a new evidentiary hearing, and (3) rejecting as implausible the city's current interpretations of its design-review standards on primary entrance, avoiding monotony, and view impact.[1]

### FIRST ASSIGNMENT OF ERROR

In its first assignment of error, the city contends that applicant never argued to LUBA that procedural unfairness required the city to reopen the record on remand and that, consequently, LUBA lacked authority to order that. The city frames the issue as one of preservation: that applicant did not expressly argue that the city's failure to reopen the record on remand was a procedural error that affected applicant's substantial rights; that the issue is therefore unpreserved; and that LUBA addressing an unpreserved issue violates ORS 197.805, which requires LUBA decisions to "be made consistently with sound principles governing judicial review," such that LUBA's order is "unlawful in substance," ORS 197.850(9)(a).

In our view, the city's argument is best understood as raising a question regarding LUBA's authority to

---

[1] The city does not challenge LUBA's rejection of the city's interpretation of two other design-review standards as implausible.

address arguments that are underdeveloped or not clearly articulated. That is so because preservation principles relate to a party's arguments to a lower tribunal or decisionmaker, whereas the issue that the city raises here pertains to the quality of applicant's arguments to LUBA itself. Conceptually, we agree with the city that rejecting undeveloped arguments helps achieve the same goals as preservation requirements, particularly "procedural fairness to the parties." *State v. Haynes*, 352 Or 321, 335, 284 P3d 473 (2012) (internal quotation marks omitted). At the same time, we recognize that it is not uncommon for tribunals to be faced with arguments that could be better developed or more clearly articulated, and, generally, determining which arguments are appropriate to address and which are not is a prudential matter for the tribunal to which they are addressed. *See State v. Brand*, 257 Or App 647, 650, 307 P3d 525 (2013) (declining to address an undeveloped constitutional argument "as a prudential matter"); *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) (discussing when we will decline to address an underdeveloped argument).

Here, the city essentially argues that any procedural unfairness argument that applicant made to LUBA was underdeveloped to the point that LUBA could not address it while acting "consistently with sound principles governing judicial review." ORS 197.805. The city also argues that LUBA's approach here was inconsistent with other cases in which LUBA has declined to consider undeveloped or inadequately developed arguments.

We are unpersuaded. Our own review of the record leads us to conclude that applicant adequately argued to LUBA that the city's procedure on remand was unfair. Applicant focused more on substance than process, and applicant did not specifically request a remand to reopen the record. But applicant's arguments are imbued with objections to the city's procedure on the first remand, including describing the city as creating "a moving target" for applicant and asserting that the city had made it impossible for applicant to know what the standards were before the record

closed and, thus, made it impossible to meet them. On the latter point, applicant argued, "Contrary to ORS 227.173(3) and [*Commonwealth*], the City has also failed to explain how [applicant] could comply. Indeed, by refusing to accept any supplemental materials, the City has made compliance impossible." Applicant also generally requested a reversal or remand of the city's order.

Certainly, applicant could have expanded its procedural-unfairness argument or articulated it more clearly. The issue was raised sufficiently, however, to provide the city an opportunity to defend the fairness of its procedure. It was not so underdeveloped as to preclude LUBA from considering it, nor was the decision to address it at odds with prior LUBA decisions to the point that LUBA needed to explain addressing it, even assuming *arguendo* that LUBA has some obligation to be consistent in determining when to address less developed arguments. Lastly, we do not perceive any error in LUBA choosing to remedy the error by remanding with specific instructions. Although applicant did not expressly request a remand for an evidentiary hearing, that remedy was within the scope of its general request for reversal or remand of the city's decision, and LUBA did not err in specifying a remedy tailored to the error.

## SECOND ASSIGNMENT OF ERROR

In its second assignment of error, the city argues that, even if applicant's briefing allowed LUBA to consider requiring the city to reopen the record on remand, that disposition is legally incorrect, such that LUBA's order is "unlawful in substance." ORS 197.850(9)(a). In the city's view, applicant was not entitled to an opportunity to respond to the city's interpretations of its design-review standards within the same application process and, relatedly, requiring the city to reopen the record for that purpose is inconsistent with *Gutoski v. Lane County*, 155 Or App 369, 963 P3d 145 (1998).

This case requires the balancing of two competing interests: local governments' interests in promulgating broad standards that they can then interpret in the course of processing applications, and applicants' interests in having

at least minimally adequate notice of the standards that will apply to their applications so that they have a meaningful opportunity to present evidence and argument in support of their applications. Many prior Oregon decisions have addressed that balance in the administrative context generally. *See, e.g.*, *Marbet v. Portland General Electric*, 277 Or 447, 463, 561 P2d 154 (1977) (in the context of energy facility siting, agency must provide notice of a standard "sufficiently in advance of the final decision so that the applicant and other parties can address the import of the standard for the particular project"); *Martini v. OLCC*, 110 Or App 508, 513, 823 P2d 1015 (1992) (agreeing with an agency "that it may make policy refinements in deciding contested cases and that those may include changes in its interpretations of statutes and rules" but also concluding that, when an agency changes "the established interpretation of a rule" to a "substantial extent" during the course of a contested case proceeding, "the parties must be given the opportunity to present evidence and arguments that are responsive to the new standard").

Both we and LUBA have also addressed that balance in the land-use context specifically. In *Gutoski*, the applicant sought rezoning of his residential property to a higher density residential zone that would allow him to build a second residence. 155 Or App at 371. His property was adjacent to an agricultural zone, where his neighbors, the petitioners, operated an orchard. *Id.* The county approved the application, and, on review, we held that the county had erred by failing to apply Goal 3, policy 8 of its comprehensive plan, which required the county to "[p]rovide maximum protection to agricultural activities by minimizing activities, particularly residential, that conflict with such use" and to interpret planning goals, policies, and regulations "in favor of agricultural activities" whenever possible. *Id.* (internal quotation marks omitted).

On remand, the county held a new evidentiary hearing and, after the record closed, issued a final order that "interpreted Policy 8 to permit a conflicting residential use as long as it did not force a significant change in or significantly increase the cost of accepted farming practices

on petitioners' farm." *Id*. (internal quotation marks omitted). LUBA affirmed the county's decision, including rejecting the petitioners' arguments that the county had erred "by refusing to reopen the evidentiary record after [it] announced [its] interpretation of policy 8 to allow petitioners to present evidence and argument relevant to the standard as interpreted." *Id*. at 372 (internal quotation marks omitted). LUBA pointed to its "test" from *Heceta Water District v. Lane County*, 24 Or LUBA 402 (1993), as to when a local government may be required to reopen the evidentiary record, and explained:

> "In the present case, petitioners do not argue that the county has changed an established interpretation, nor do they identify what responsive evidence not already in the record they seek to submit. As the county and intervenor point out, the meaning of Policy 8 was an intensely debated issue in both proceedings below. Where the interpretation of a local provision is a matter of first impression for the local government, the participants should have realized that a variety of interpretations might be adopted, and should have presented their evidence accordingly."

*Gutoski*, 155 Or App at 372-73 (internal quotation marks omitted).

We affirmed LUBA's decision on review. We agreed with LUBA that the county did not have to provide the petitioners with another opportunity to present evidence under the particular circumstances:

> "Generally, as in the trial court and the agency setting, interrelated questions of fact and law are 'tried' and decided simultaneously in the local land use hearing process. From the standpoint of both litigants and decisionmakers, questions of fact and of law can have reciprocal effects on the answers to one another, and the ability to deal with the two as part of the same exercise is an essential tool of the advocate's craft. Hence, what petitioners appear to perceive as a chicken-and-egg problem that is somehow unique to this case is, in our view, simply a variation of a standard practice in which lawyers and judges have been engaging for centuries."

*Id*. at 373.

At the same time, we agreed with LUBA that, in other circumstances, "the parties to a local land use proceeding should be afforded an opportunity to present additional evidence and/or argument responsive to the decisionmaker's interpretations of local legislation and that the local body's failure to provide such an opportunity when it is called for can be reversible error." *Id.* (citing, 110 Or App 508). We identified two conditions that, at a minimum, would need to be present to reverse on that basis:

> "First, the interpretation that is made after the conclusion of the initial evidentiary hearing must significantly change an existing interpretation or, for other reasons, be beyond the range of interpretations that the parties could reasonably have anticipated at the time of their evidentiary presentations. Second, the party seeking reversal must demonstrate to LUBA that it can produce specific evidence at the new hearing that differs in substance from the evidence it previously produced and that is directly responsive to the unanticipated interpretation."

*Id.* at 373-74 (emphasis in original; footnote omitted).[2]

Neither of those conditions was met in *Gutoski*. First, from the text and context of policy 8, the petitioners could have anticipated that the county would adopt an interpretation prohibiting residential development only if it would have a "substantial effect" on agriculture and, indeed, LUBA had noted that the petitioners actually did submit evidence relevant to such an interpretation. *Id.* at 373, 374. Even if the petitioners disagreed with the interpretation that the county ultimately adopted, they should have "reasonably foreseen" it. *Id.* at 374 (emphasis omitted). Second, the petitioners had not identified any additional evidence, "specifically or by kind," that they could have presented. *Id.*

---

[2] In *Heceta Water District*, LUBA explained the relevance of those considerations as going to LUBA's inquiry overall—whether the local government committed a procedural error *and* whether the error prejudiced the petitioner's substantial rights. 24 Or LUBA at 415-19; *see also* ORS 197.835(9)(a)(B) (LUBA shall reverse or remand a decision if it finds that the local government "[f]ailed to follow the procedures applicable to the matter before it in a manner that prejudiced the substantial rights of the petitioner"). We understand *Gutoski* to take the same approach, *i.e.*, showing what evidence the party would have submitted if given the opportunity goes to prejudice, not whether there was a procedural error.

"In the absence of any demonstration that petitioners have a meaningful and nonredundant showing to make, LUBA properly did not, and we cannot, conclude that the county erred by not acceding to their request for a second hearing." *Id.* at 375.

In this case, the city argues that LUBA erred in remanding with instructions to reopen the record, because neither of the conditions discussed in *Gutoski* is present. LUBA implicitly disagreed. We also disagree.

As to the first *Gutoski* condition, the city interpreted its design-review standards for the first time after the evidentiary hearing on applicant's application. Because it announced its interpretations for the first time, rather than changing existing interpretations,[3] the question is whether the city's interpretations are "beyond the range of interpretations that the parties could reasonably have anticipated at the time of their evidentiary presentations." *Id.* at 374.

Three aspects of *Gutoski* shed light on what we meant by the range of interpretations that "could reasonably have been anticipated at the time of [the] evidentiary presentations." First, the comprehensive plan policy at issue in *Gutoski* did not purport to absolutely prohibit residential development near agricultural uses, *id.*, such that the petitioners reasonably should have anticipated the county adopting a standard that looked at the effect of proposed residential development on nearby agricultural operations and any evidence presented on that issue. Second, the meaning of policy 8 had been "intensely debated" in the two proceedings before the county, *id.* at 373 (internal quotation marks omitted), which suggests that the petitioners in *Gutoski* had some notice of the possible interpretations under consideration. Third, the petitioners in *Gutoski* did anticipate the county's interpretation to some extent, in that

---

[3] This likely is not the first time the city has interpreted the standards at least by applying them, but there is no established interpretation to which the parties agree or that is demonstrated by the record. Accordingly, for current purposes, we assume that there is no existing interpretation. *See generally Martini*, 110 Or App at 511 n 3 (noting that, although the Oregon Liquor Control Commission's previous interpretation of the relevant rule was unclear from the record, the parties agreed that it existed and agreed on its substance).

they "did submit evidence relevant to the impacts of residential development on their farming operations, in the form of the prior lawsuit and testimony about the changes and costs resulting therefrom." *Id.* at 373 (internal quotation marks omitted).

In this case, we conclude that applicant could not have reasonably foreseen the city's interpretations of the three design-review standards at issue on judicial review.[4] As noted in *Gutoski*, litigating the facts and the law at the same time is part of advocacy, and advocates may need to tailor their evidentiary presentations to address several possible interpretations of a legal standard, including any evident from reading the text in context and any advocated or discussed during the proceedings. *Id.* at 372-73. However, that principle finds its limit where, as here, the text of the standards is so subjective as to allow for dozens of potential interpretations and resulting evidentiary requirements, and, at the same time, there was no debate or discussion before the record closed of any interpretations like the ones the city later announced.

Consider the city's requirement that "[m]onotony of design in single or multiple building projects shall be avoided. Variety of detail, form, and site design shall be used to provide visual interest." WZO 11.050(4)(b)(3). Absent guidance from the city as to what it considers "monotonous" or what it means by "visual interest," an applicant could never reasonably foresee and address all possible interpretations of that standard.

---

[4] We also reject the city's argument that applicant reasonably should have anticipated the city's interpretation of another standard, the direct pedestrian connection standard, which appears in WZO 11.050(4)(a)(6) and that, consequently, LUBA should have affirmed the city's denial of the application based on applicant's failure to meet that standard. After remanding the city's first attempt at interpreting that standard, LUBA concluded in its second opinion that the city's interpretation was plausible. We observe that an interpretation of a vague standard may be plausible and yet still one of so many possible interpretations that an applicant could not reasonably anticipate it. We also note that the burden on an applicant increases exponentially with each additional vague standard that a local government interprets for the first time (or reinterprets significantly differently) after closing the record. In these particular circumstances, we conclude that the city's plausible interpretation of the direct pedestrian connection standard did not require LUBA to affirm the city's denial of the design-review application.

As previously discussed, city staff recommended approving applicant's application as meeting all applicable standards, hearings were held, the record closed, the city then voted to deny the application on grounds apparently unrelated to the design-review standards, and a month later the city made findings based on newly announced interpretations of the design-review standards. Applicant could not have reasonably anticipated the interpretations that the city announced, so as to preemptively address them before the record closed. That is particularly so in light of how broadly the standards are written. The first *Gutoski* condition is met.

The second *Gutoski* condition is that "the party seeking reversal must demonstrate to LUBA that it can produce specific evidence at the new hearing that differs in substance from the evidence it previously produced and that is directly responsive to the unanticipated interpretation." 155 Or App at 374. That condition is also met. On remand, applicant "attempted to submit supplemental application materials, and asked the city to reopen the record and consider the materials." The city rejected that request, which is why the materials are not in the record. Under the circumstances, LUBA was satisfied that applicant had demonstrated that it actually had responsive materials that it would have submitted if given the opportunity. We agree that the demonstration was sufficient in these circumstances.

To summarize, under *Gutoski*, it would be improper for LUBA to remand to a local government with instructions to reopen the record if (1) the applicant had at least minimally adequate notice of the local government's interpretation of its standards in time to submit responsive materials in support of its application, which some standards provide merely by virtue of having relatively few plausible interpretations, or (2) the applicant has not shown that it could have put in more evidence with adequate notice. Neither is the case here. We therefore reject the city's argument that LUBA requiring the city to reopen the record on remand is inconsistent with *Gutoski*. As for whether there is any inconsistency within LUBA's own case law, that is a matter for LUBA, as LUBA cases are not binding on this court. *See*

*Friends of Yamhill County v. Board of Commissioners*, 351 Or 219, 251-52, 264 P3d 1265 (2011) (noting that LUBA decisions are not binding on the Supreme Court).[5]

## THIRD ASSIGNMENT OF ERROR

In its third assignment of error, the city argues that LUBA's order is "unlawful in substance," ORS 197.850(9)(a), because, as to three of the city's design-review standards, LUBA wrongly concluded that the city's interpretation was implausible under *Siporen* and inadequately explained under *Commonwealth*.

LUBA may reject a local government's interpretation of its own zoning ordinances only if the interpretation is inconsistent with "the express language of" the ordinance, "the purpose for" the ordinance, or "the underlying policy that provides the basis for" the ordinance, or if it is "contrary to a state statute, land use goal[,] or rule that the [zoning ordinance] implements." ORS 197.829(1). We apply "'the interpretative principles that ordinarily apply to the construction of ordinances under the rules of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), as modified by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).'" *Gould v. Deschutes County*, 272 Or App 666, 675, 362 P3d 679 (2015) (quoting *Setniker v. Polk County*, 244 Or App 618, 633-34, 260 P3d 800, *rev den*, 351 Or 216 (2011) (brackets omitted)). If the local government's interpretation "plausibly accounts for the text and context" of the provision, then LUBA and we must defer to that interpretation. *Siporen*, 349 Or at 262. The fact that "a stronger or more logical interpretation exists does not make a local government's interpretation implausible." *Gould*, 272 Or App at 675.

---

[5] Among other things, the city argues that in *Schatz v. City of Jacksonville*, 25 Or LUBA 327, 339, *aff'd without opinion*, 122 Or App 299 (1993), LUBA "held that a local government has the right to approve or deny an application based upon the original application and 'nothing requires the city to allow modifications to the application for proposed development' on remand." Because the city excluded applicant's additional materials from the record, it is unclear whether they were simply additional materials or would modify the application, but LUBA's order seems to contemplate the possibility of a modified application in this case. We are unpersuaded that *Schatz* alone establishes that LUBA erred in that regard.

As for *Commonwealth*, in that case, the county denied preliminary approval of a subdivision based on its interpretation of general policies in its comprehensive plan. 35 Or App at 389. On appeal from a judgment on writ of review, we rejected the notion that the comprehensive plan's "broadly worded general policy statements were too vague to serve as standards by which approval of the proposed subdivision plat could be granted or denied." *Id.* at 389, 396. At the same time, we recognized that a local government's power to rely on broad standards in quasi-judicial proceedings is tempered by an applicant's right to notice of the standards to be applied: "It is not necessary that every standard used by an agency [be] specifically articulated prior to the initiation of an administrative proceeding 'as long as it is in fact adopted as a standard *** sufficiently in advance of the final decision so that the applicant *** can address the import of the standard for a particular project ***.'" *Id.* at 400 (quoting *Marbet*, 277 Or at 463 (ellipses in *Commonwealth*)); *see also id.* ("[I]t is necessary for the county, at some time, to announce to a subdivider both which plan policies will govern the granting of such approval and specifically how those policies will be applicable to the project in question."). Further, in the subdivision context, if the planning authority were to deny tentative approval, the grounds "must be articulated in a manner sufficiently detailed to give a subdivider reasonably definite guides as to what it must do to obtain final plat approval, or inform the subdivider that it is unlikely that a subdivision will be approved." *Id.*

We concluded that the county's order at issue in *Commonwealth* did not provide the applicant with sufficiently definite information as to what was needed to obtain approval. *Id.* at 400-01. For example, as to the broad comprehensive-plan standard that "the distinctive natural features (of a site) *** be retained and incorporated into all developments," the county relied on previously unarticulated numerical standards. *Id.* at 397-98. "Nowhere did the [county] indicate why it chose trees of 8-inch caliper, lot clearance of 35 percent or road cuts of over 7 feet as the standards by which compliance with the policy involved here was to be measured. More importantly, nowhere did it indicate what figures, if any, would be acceptable." *Id.* (internal

citations omitted). We therefore reversed and remanded "for more adequate findings and conclusions." *Id*. at 389.[6]

With that understanding of the applicable standards, we turn to the three design-review standards as to which the city challenges LUBA's conclusion that the city's interpretations were implausible under *Siporen* and inadequate under *Commonwealth*.

*Primary Entrance (Street Trees)*. The first standard at issue is the primary-entrance standard, which appears in WZO 11.050(4)(a)(6) and requires a pedestrian courtyard/plaza with "street trees." The city interprets that standard as requiring not only the trees themselves but "some open area to allow for tree growth." LUBA concluded that the city's interpretation was inconsistent with the text. We disagree. We agree with the city that it is plausible to interpret that standard to require at least some space for the trees to grow. We therefore reverse LUBA's order on that point.

At the same time, we note that, to comply with *Commonwealth*, the city must communicate to applicant how many trees are required and how that determination is supported by the text, context, and purpose of the standard; the minimum amount of "open space" required for each tree and how that determination is supported by the text, context, and purpose of the standard; and how the space will be measured. *Cf. Commonwealth*, 35 Or App at 398-99.

*Avoid Monotony*. The second design-review standard at issue requires visual interest: "Monotony of design in single or multiple building projects shall be avoided. Variety of detail, form, and site design shall be used to provide visual interest. In a Planned Development, no more than 25% of all buildings in the development shall replicate the same roofline or footprint." WZO 11.050(4)(b)(3).

In its first order, the city indicated that applicant's proposed design of the north and west elevations was

---

[6] We did not directly address in *Commonwealth* what should be done about the lack of notice that the applicant had received. Nonetheless, we agree with LUBA that our discussion of notice requirements in *Commonwealth* lends some support to its decision to remand for a new evidentiary hearing, although we ultimately view *Gutoski* as more on point.

monotonous. LUBA concluded that the city's explanation for that position was inadequate under *Commonwealth*. In its second order, the city explained that, because no side of the building would be shielded from public view, the design of each elevation had to independently meet the avoid-monotony standard. Using the south elevation as a reference point, because it had been found to be nonmonotonous, the city stated that it "relies on a 25% replication reference and concludes that a change in roof line, wall recess, materials, window size and placement for every quarter of linear length of an elevation could satisfy WZO 11.050(4)(b)(3)." In a footnote, the city "acknowledged that the 25% requirement is not 'directly required' by the provision, and that other alternative approaches could satisfy the criterion."

Applicant argued to LUBA that the city's interpretation of the standard—which would mean that, on each elevation of the building, there must be three changes in roof line, three changes in wall recess, three changes in materials, and three changes in window size and placement—was implausible. Applicant further argued that the provision that, "[i]n a Planned Development, no more than 25% of all buildings in the development shall replicate the same roofline or footprint," WZO 11.050(4)(b)(3), did not apply because applicant was not proposing a planned development and, in any event, even in planned developments the standard refers to 25 percent of all *buildings*, not 25 percent of each elevation of a single building.

LUBA agreed with applicant that the city's interpretation of the avoid-monotony standard was inconsistent with the written standard. It rejected an elevation-based 25 percent requirement as unsupported by anything in the written standard. LUBA further stated that the written standard itself was "exceedingly vague" and that, absent any clear direction in the standard itself, "the city's discretion to require changes to petitioner's design on remand is extremely narrow. On remand, for the east, north, and west elevations, the city may require petitioner to submit a revised design that includes similar features that the city has already concluded would satisfy the Avoid Monotony Standard on the south elevation."

The city argues that LUBA erred because, although the 25 percent requirement does not come from the text of the standard as it applies to single buildings, it is (1) supported by the context of the sentence that applies to planned developments, which does include a 25 percent requirement, and (2) based on the south elevation of applicant's proposed development. The city also asserts that LUBA's decision "puts local governments in an impossible situation" by, on the one hand, requiring specificity in findings regarding broad and vague standards while, on the other hand, rejecting the city's attempt to provide that specificity—by giving objective and quantifiable directions to applicant—as unmoored from the standard's text and thus "implausible" under *Siporen*.

We agree with LUBA that the city's interpretation of the avoid-monotony standard is implausible, because it adopts the 25 percent replication rate that the standard applies only to evaluate monotony in a multi-building planned development and applies it to each elevation of a single building that is not in a planned development. As the city essentially acknowledges, nothing remotely like the city's proposed method is suggested by the exhortations to avoid monotony and that "[v]ariety of detail, form, and site design shall be used to provide visual interest."

As for the city's claim that it is in an "impossible" position, it is the city's choice to have an exceedingly vague standard. The trade-off for that vagueness is that, to satisfy fair notice requirements, the city must communicate informally or formally with applicants to provide specific information about how the city interprets the standard, and the city must deal with appeals and judicial review when applicants feel they did not have fair notice. *Accord Commonwealth*, 35 Or App at 397-98 (noting the lack of textual support in vague policies for the numerical standards that the county had applied).

*View Impact.* WZO 11.050(4)(b)(5) provides that "[t]he impact that structures will have on views from adjacent or other areas will be taken into account."

In its first decision, the city stated that the standard was "intended to protect views, including those from

adjacent structures or structures in other areas," and that the proposed development did not meet the standard because a house across Highway 101 "would have its view of the Nehalem Bay adversely affected" by the development. On review, LUBA rejected that reasoning as failing to account for the fact that 90 percent of the site was protected open space, that the proposed development complied with the maximum height allowed in the zone (24 feet), and that the proposed development was for uses allowed outright in the zone. LUBA also noted that *any* development on the site would affect views of the bay, because "there is nothing obstructing that view presently." LUBA directed that, "[o]n remand, the city must evaluate compliance with WZO 11.050(4)(b)(5) with the understanding that [applicant's] use is permitted outright on the property, and that the city cannot, consistent with the United States Constitution, interpret the provision in a manner that results in a de facto view easement over petitioner's property." *Botts Marsh I*, ___ Or LUBA at ___ (slip op at 32).

On remand, the city made findings that suggest a needs-based approach to approving building height and size:

"Designing a building that is responsive to WZO 11.050(4)(b)(5) requires some analysis of the degree to which the proposal affects views and whether there are any design changes that could provide greater view protections while not compromising the applicant's desired use. For example, it may be that a functioning fish processing facility requires machinery or systems that require a 24 [foot] tall building. If so, it may be that the building['s] roof cannot be reduced."

The city noted that the proposed development might affect views from a variety of locations, including downtown Wheeler, and faulted applicant for not submitting "drawings or renderings that would allow the Council to consider the impacts of this development on the views from any location." The city explained:

"[The] design of the building does not acknowledge its location adjacent to the bay or factor in the views from downtown Wheeler. It is simply a full block at the maximum permitted height. A design that stepped back, sloped up to the east,

or otherwise acknowledged and addressed view concerns would be more likely to satisfy this criterion. Moreover, the appropriate consideration of the compatibility in WZO 11.050(4)(b)(1) and architectural style in WZO 11.050(4)(b)(2) may well address most of the concerns regarding views. But again, without any renderings showing how this building will look in context from town, Highway 101, the bay, or anywhere else, and without some analysis of the identified issues, it is not possible to determine the degree to which the view will be impacted and without some explanation for the need for a building at maximum height for its full length, the Council cannot conduct the necessary review. For this reason, the Council finds that the applicant has not demonstrated that WZO 11.050(4)(b)(5) is satisfied."

On review, LUBA concluded that the city's interpretation of the view-impact standard improperly imposed "a need-based requirement for developing a building" that will house a use that is allowed outright in the zone. LUBA further concluded that the city's interpretation did not comply with *Commonwealth*, because it did not "give petitioner *assurance* regarding what would be required to satisfy the View Impact Standard, except to suggest that 'a design that stepped back, sloped up to the east, or otherwise acknowledged and addressed view concerns would be *more likely* to satisfy this criterion.'" (Emphases in LUBA opinion.) LUBA also noted that the city had yet to address the fact that 90 percent of the subject property will remain open space.[7]

Ultimately, LUBA concluded that the city had "very limited" discretion to require design changes on remand under the circumstances, relying on its treatment of an analogous issue in *GPA 1, LLC v. City of Corvallis*, 73 Or LUBA 339 (2016), and *GPA 1, LLC v. City of Corvallis*, 74 Or LUBA 527 (2016), which it discussed extensively. In conclusion, LUBA explained:

"Similarly, here, because petitioner's proposal is for a use permitted outright on the property, the city has very limited discretion on remand to require changes to the design to comply with the View Impact Standard. That

_____

[7] LUBA also addressed the city's criticism of applicant for failing to provide drawings or renderings of the view impact from various locations. Because the matter is being remanded to the city with instructions to reopen the record, we do not address that aspect of LUBA's second order.

limited discretion does not allow the city to require petitioner to lower the height of the building that is otherwise allowed under WZO 2.040(1) and WZO 3.040(1). Moreover, as we cautioned in *Botts Marsh I*, the city may not interpret or apply the View Impact Standard in a manner that results in a *de facto* view easement on petitioner's property."

We agree with LUBA that the city's imposition of a needs-based requirement for developing a building for a use permitted outright on the subject property is implausible. That is, the requirement that "[t]he impact that structures will have on views from adjacent or other areas will be taken into account," WZO 11.050(4)(b)(5), does not plausibly require an applicant to persuade the city that the applicant's use "requires" a building of a certain size because of what it must contain (such as fish-processing machinery). Rather, the only necessary explanation of the applicant's need or desire to develop the building is that the use, and, thus, the building, is permitted in that location. The city may require the applicant to show that the view impact has been taken into account in *some* way, but it may not require the applicant to show a case-specific "need" for a building of a certain height or width.

Finally, the city questions LUBA's statement that the city has "very limited" discretion on remand under the circumstances here. The city points out that it is permitted to deny applications that fail to comply with its design review standards, and it asserts that it is simply trying "to follow its code, which requires an application for design review to take views 'into account,'" and suggests that it should be free to reinterpret the view-impact standard on remand, including addressing any arguments by applicant. We do not disagree with the city that it is permitted to deny applications for design review that do not show compliance with its standards. However, as we have explained, we agree with LUBA that, in this case, the city has repeatedly failed to give applicant adequate notice of what those standards are and how compliance with them will be assessed. To the extent that LUBA lacked authority to limit how many times the city may freely reinterpret a vague provision that applies to a use permitted outright, the city has failed to meaningfully develop its argument on that issue, and we

are not presently persuaded that LUBA could not do what it did.

Reversed in part and remanded.